# Staunton

## STEWART-WARNER CORPORATION V. MARVIN SMITHEY, ET ALS.

September 20, 1934.

Present, All the Justices.

478

*Reversed.*

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore,* for the appellant.

*Scott, Lloyd & Scott* and *Charles J. Williamson,* for the appellee.

Browning, J., delivered the opinion of the court.

The appellant is a Virginia corporation, with its chief office in the city of Chicago, engaged in the manufacture and sale of automobile accessories, and in relation to this case, particularly speedometers.

The appellee, a lawyer from Lawrenceville, Virginia, is the inventor of devices for speedometers, particularly one of the nature of a mileage period signaling contrivance, which consisted in marking in contrasting colors the base of certain numerals on the periphery, or circumference, of the wheels of the season odometer of a speedometer, so that when the numerals with the colored markings appeared at regular intervals the operator of the automobile would be informed of the fact that some part of his car was in need of lubrication.

At the beginning of the contractual relations between the parties hereto, Mr. Smithey, the inventor, was the owner and patentee of a number of United States and foreign patents and was the owner of applications for patents in the United States and certain foreign countries, relating to speedometers and speedometer devices. Mr. Smithey will hereafter be generally referred to as the licensor and the Stewart-Warner Corporation as the licensee and the contracts between them will be designated as the original license agreement and the supplemental license agreement, respectively.

On November 9, 1921, the licensor granted to the licensee the exclusive right to manufacture and sell, throughout the world, the inventions and devices, covered by his issued patents, or those which might be covered by patents to be issued upon his applications. This applied to inventions and applications in existence at the date of the license agreement and to those produced or acquired by the licensor during the currency of the license which extended to the end of the term or terms of the patents.

The parts of the original license agreement deemed necessary to be here quoted are as follows:

"First: The licensor hereby grants to the licensee the full and exclusive right and privilege of manufacturing and selling throughout the United States and the world, the inventions and devices or any of them, which are embodied in and covered by said issued patents, or may be covered by the patents to be issued upon said applications or any of them, to the full end of the term and terms of said patents issued and to be issued respectively, subject to the conditions and royalty hereinafter expressed.

"Second: The licensee accepting this license undertakes and agrees promptly, to the utmost of its ability and facilities, to develop and produce for market at least one of the devices of the nature of a mileage period signaling device, disclosed and embodied in one or more of the patents and applications of the licensor above listed, and to use its best efforts and its advertising and marketing facilities to create and supply a market demand for said devices in the United States, and agrees that it will, to the utmost of its manufacturing facilities at all times throughout the currency of this license, meet and supply said demand."

The third section contained the schedule of royalties that the licensee agreed to pay to the licensor for the devices manufactured and sold thereunder and in subsection (b) thereof was set forth the royalty provision relating to the lubrication period markings device, which was the sole device manufactured by the licensee under the agreement and the only one which is in issue in this controversy. This subsection is as follows:

"Upon and for mileage period signaling devices (as lubrication indicators), when constructed in combination with a speedometer and when a single unitary price is obtained for the combined instrument, seven and one-half cents (7½c) each."

There are nine additional clauses in the agreement containing various provisions relating to conditions under which either party might terminate the agreement, the rights of the parties in the event of infringement of the patents, the keeping of a record of the sales subject to

royalty, the reports thereof and payments to be made and other rights not important, we think, to be enumerated.

During the first eighteen months of the licensee's operations under the aforesaid agreement the licensor was paid some twenty-four thousand dollars on account of royalties, at which time, or shortly thereafter, a controversy arose between the licensor and the licensee with respect to the nature and extent of the licensee's obligations under the agreement. This resulted in the institution of a suit in the Law and Equity Court in the city of Richmond, by the licensor, in which was set forth his contentions as to the proper construction of the agreement and the allegation that the licensee had breached its provisions and praying for an accounting for royalties which were claimed to be due him and for a construction of the agreement. The licensee filed its answer denying the allegations of the bill and asserted a counter claim for repayment of certain royalties which it charged had been paid to the licensor by mistake.

During the pendency of this suit, after the plaintiff had taken his depositions, one of the licensee's attorneys dispatched a telegram to one of the licensor's attorneys suggesting a conference at Chicago for the purpose of an adjustment of the matters in controversy which would end the litigation. This telegram, dated September 5, 1924, is as follows:

"Developments lead us to believe that a frank conference will result in an adjustment of Smithey-Stewart-Warner suit more advantageous to Smithey as well as to Stewart-Warner than Smithey's success in the present suit. Stop. Accordingly we have a proposition to submit which ought to be very interesting to Mr. Smithey. Stop. Will you stipulate extension to October 1st for closing Defendant's depositions and bring Mr. Smithey with you on Tuesday for such conference. Stop. Wire answer."

Pursuant to this telegram the licensor, Smithey, with his patent attorney, Charles J. Williamson, and his attorney, George Bryan, arrived in Chicago on September 9, 1924,

and went into conference on that day with C. B. Smith, president of Stewart-Warner Corporation, licensee, and T. T. Sullivan, its treasurer.

The supplemental license agreement, dated September 10, 1924, growing out of the conference is as follows:

"Whereas the undersigned Marvin Smithey of Lawrenceville, Virginia, and Stewart-Warner Speedometer Corporation, a corporation of the State of Virginia having principal office at Chicago, Illinois, hereinafter referred to respectively as the licensor and licensee, heretofore entered into a license agreement dated November 9, 1921, and recorded in the United States Patent Office November 17, 1921, Liber W-114, page 362, hereinafter referred to as the 'original license,' and disagreement and controversy has arisen between said licensor and licensee as to the intent and meaning of said contract and as to the amount of the liability of the licensee to the licensor for royalty thereunder, and suit was brought on or about the 23rd day of January, 1924, by the licensor against the licensee in the Law and Equity Court of the city of Richmond, Virginia, entitled Marvin Smithey, complainant, against Stewart-Warner Speedometer Corporation, defendant, for the adjudication of said controversy and recovery from the licensee of certain amounts claimed to be due from the licensee to the licensor under said original license, and whereas said parties have undertaken to adjust and settle said matters in controversy between them out of court.

"Now, therefore, these presents witness that for one dollar ($1.00) in hand paid by each of said parties to the other and upon mutual considerations hereinafter expressed, said licensor and licensee have agreed and do hereby agree as follows:

"First: That suit pending in the Law and Equity Court of the city of Richmond, Virginia, by Marvin Smithey, complainant, against Stewart-Warner Speedometer Corporation, defendant, shall be dismissed forthwith without costs of record as against either party.

"Second: The licensee shall and will pay to the licensor

upon the execution and delivery of this agreement the following sums:

"(a) The sum of seventy-five hundred dollars ($7500) covering the due and proper fees of the petitioner's solicitors and counsel incurred in said suit.

"(b) The amount of the complainant's costs and expenses taxable as costs in said suit to be paid as soon as the amount thereof can be ascertained.

"(c) An amount equal to seven and one-half (7½) cents per instrument for the total number of Stewart Ford Speedometers having lubrication markings made and sold by the licensee from and after September 30, 1923, to and including September 10, 1924.

"Third: It is agreed that the course pursued by the licensee for creating a market demand for the devices covered by said original license, said course consisting in applying lubrication period markings to the speedometers put upon the market by the licensee for Ford cars, commonly called the 'Stewart Ford Speedometers,' and soliciting car manufacturers for which said licensee produces and furnishes Stewart speedometers as standard equipment of said cars, to order and accept Stewart speedometers having such lubrication period indications at an advance over the price of the same speedometers without such indication corresponding to the cost of adding said indications and interpretative charts therefor, with reasonable margin of profit over said cost if desired by said licensee, is due compliance with the requirements of section second of said original license and the continuance of that course in the future will be due compliance with said original license.

"Fourth: From and after the date hereof, regardless of the issuance or non-issuance of patent or patents covering or purporting to cover the construction in respect to mileage period lubrication indications, it is further agreed, modifying subsection (b) of section third of said original license, that the licensee shall and will pay to the licensor royalty at the rate of three and three-quarters (3¾) cents per instrument and no more upon, for and in respect to all

instruments manufactured and sold by said licensee having lubrication markings on the regular odometer number wheels or dials and without added mechanism other than an interpretative chart associated with the speedometer casing without operative connections with the odometer mechanism, accounting to be made and royalties to be paid as provided in said original license.

"Except as modified by this provision said section third and all subsections thereof of said original license are confirmed and continued in force unchanged.

"In all other respects the said original license is hereby confirmed and continued in force.

"It is further agreed that the said sum of seventy-five hundred dollars ($7500) specified in subsection (a) of section second foregoing, shall be refunded to the licensee by the licensor by means of deducting from the amount accruing and payable quarterly as royalties under said original license ten per cent of said quarterly accruing royalties until the total amount so deducted shall equal and absorb the said sum of seventy-five hundred dollars ($7-500)."

The licensee paid to the licensor the amount ascertained to be due him under the provisions of subsection (c) of section second of the supplemental license agreement, which was, in round numbers, seventeen thousand dollars, and made the advancement to him of seventy-five hundred dollars under the provisions of subsection (a) of the same section, and in accordance with the first section the suit was dismissed, after the payment by the licensee of the complainant's taxable costs and expenses included in subsection (b) of the second section of the agreement.

The construction of section third of this supplemental license agreement placed the parties again at antipodes. The licensee, under the original license agreement, manufactured and sold its speedometer, designated as model 160, in which it incorporated the simplest mechanism of the licensor's lubrication period markings device. This was known as the Stewart Ford Speedometer, which was

designed for use on Ford cars. At that time the Ford Motor Company was putting out its model T car, which was not equipped with a speedometer of any sort. Thus the Stewart Ford Speedometers, model 160 with the lubrication period markings, found ready sale for a time to dealers in and individual owners of Ford cars.

When the supplemental license agreement was entered into the licensee was not incorporating the licensor's device in all of the speedometers it was manufacturing and selling for Ford cars. Nearly an eighth of the number of Model 160 which were sold were without colored dials.

In addition to the foregoing the licensee had been soliciting car manufacturers to adopt the Stewart speedometer containing the licensor's device under the conditions enumerated in section third of the supplemental license agreement.

██ It will be observed that the substance of pith of the supplemental license agreement was the outlining of or defining what had been done in the past by the licensee, which was agreed by the licensor to be due compliance with the conditions and requirements of the original license agreement for both the past and future. While it is in mind, it is well to note that the licensor contended, by his construction of section third, that the second part of the section, dealing with the second duty of the licensee thereunder, by the use of the words "produces and furnishes," restricted its application to such car manufacturers as the licensee was *then* furnishing with speedometers as standard equipment.

Our comment here is that the provision that, "the continuance of that course in the future will be due compliance with said original license," negatives the suggestion that the former words had only a present tense effect.

There was a dual course of conduct upon the part of the licensee as having been performed by it in the past which was expressed quite definitely, certainly and understandably. This being a fair statement, we are brought, at the threshold, to a consideration of the parol evidence rule

which makes illegal and inadmissible parol evidence to vary the terms of a written contract.

It was said by the late eminent Burks, J., in the case of *Coal River Collieries* v. *Eureka Coal & Wood Co.,* 144 Va. 263, 132 S. E. 337, 343, 46 A. L. R. 485: "The parol evidence rule in effect declares that, where parties have reduced their contract to a writing which imposes a legal obligation in clear and explicit terms, the writing shall be the sole memorial of that contract, and it is conclusively presumed that the writing contains the whole contract. The writing alone is the evidence of the contract, and no other will be received."

And in the same case it was said: "We know of no jurisdiction in which the parol evidence rule has been more often invoked and more strictly adhered to in its integrity than this, and we have found no case in which it has been relaxed."

Of course, if the agreement or writing is ambiguous, parol evidence is admissible to explain the ambiguity. It was said in the case cited above, applicable to the circumstances of that case, "the parol evidence is offered first to create an ambiguity and then to remove it. This cannot be done without abolishing the parol evidence rule and overturning a long line of cases running back for three-quarters of a century." This has quite a relevant application to much of the great volume of evidence which has been elicited in this case.

The important contentions of the licensor were:

(1) That the licensee was obligated to apply the colored dial lubrication markings to all speedometers of its manufacture.

Our comment as to this is that this had not been its course of conduct as set forth in section third of the supplemental license agreement and we find nothing in this section which fixes such a liability upon the licensee.

(2) That the licensee breached the supplemental license agreement by offering the Ford Motor Company a speedometer as standard equipment, with the colored dials,

but at a price higher than that of the same speedometers without the colored dials, the advance in price to take care of the cost incident to the installation of the device and a reasonable margin of profit to the licensee, if it so desired.

Our comment here is that, in our opinion, section third provided for just this course of conduct, in setting forth in plain terms that it had been doing just this thing in relation to car manufacturers whose speedometer business as standard equipment it had been soliciting and that such conduct, it was agreed, was due compliance, in the past and for the future, with the original license agreement.

■ (3) That the licensee in manufacturing and selling to the Ford Motor Company speedometers, without the colored lubrication dials, as standard equipment violated the terms of section third of the supplemental license agreement.

As to this we have to say that we find nothing in section third of the supplemental license agreement, or in any other section of the same, or in any section of the original license agreement, existent after being modified by the supplemental agreement, which prohibited the conduct complained of, provided the speedometers sold to the Ford Motor Company, as standard equipment, were not what was commonly called or known to the trade as "Stewart Ford Speedometers."

In this connection it should be said that the Ford Motor Company adopted a new and different policy in 1927 from that to which it had adhered since 1915, in that it installed on its new Model A car a speedometer as standard equipment, which was supplied by the licensee. This speedometer was made in accordance with the plans and specifications of the Ford Motor Company. It was a different instrument from that commonly called the Stewart Ford Speedometer.

■ The contention is made by the licensor that the speedometer furnished by the licensee to the Ford Motor Company for its Model A car is not standard equipment. This contention is based upon some of the testimony of the

witnesses, put on by the licensee, including some of its officials, which isolated, would seem to warrant the contention, but taking all of the testimony together on this point we think there is no doubt of the fact that the aforesaid speedometer is standard equipment. Moreover, the bill filed by the licensor alleges that it is standard equipment and the answer of the licensee admits it.

The testimony above referred to is, we think, admissible because it may be said to have been elicited to explain the meaning of the term "standard equipment," and the explanation of its meaning does not offend the parol evidence rule.

We think there can be no doubt that the general term, "Ford cars," is qualified and restricted by the particular terms, "commonly called the 'Stewart Ford Speedometer.'"

We do not take it that the words and expressions employed admit of the interpretation that the speedometers put upon the market by the licensee "for Ford cars" were to be any speedometer that the licensee might manufacture and sell, but the speedometer referred to must be that which was "commonly called the 'Stewart Ford Speedometer.'" Indeed, that was described in section third as the course that had been pursued by the licensee. Both parties to the supplemental license agreement agreed to this as due compliance with the original license, and they were conversant, of course, with the subject matter as to which they were treating.

It must be borne in mind that much of the evidence, consisting of oral testimony and correspondence, has to do with acutely controversial matters, existing before the execution of the supplemental agreement, which were set at rest by its terms. The only really ambiguous element in the supplemental license agreement which is important is the term, "Stewart Ford Speedometers." The testimony on this point, which is not controverted, defines this term as applying to the speedometers which the licensee had been manufacturing for Ford cars and marketing them through direct sales to Ford car owners and dealers at its branch stores

and through sales to its numerous service station distributors, who in turn sold them to Ford car owners for installation in their cars. It was called a curbstone instrument. This was a distinct branch of the licensee's speedometer business which developed into proportions of magnitude because the Ford Motor Company did not equip its car with any speedometer for a long period of years.

This speedometer was not limited to one model. It first appeared as Model 160 and again in another form as Model 490, which was put upon the market in 1927. These speedometers were advertised by the licensee as "Stewart Ford Speedometers" and were commonly called by the trade by that name. By the very terms of section third of the supplemental agreement this branch of the licensee's speedometer business was placed in contradistinction to that of its course of soliciting car manufacturers to order and accept speedometers with the lubrication period markings as standard equipment.

With the only term in the supplemental license agreement of doubtful meaning clearly defined by the undisputed evidence, we are of the opinion that the whole agreement is plain and unambiguous.

In 6 R. C. L. 843, section 232, it is said: "If it appears that an ambiguous term in a contract has an established meaning among those engaged in the business to which the contract has reference, and unless it is given that meaning it is indefinite and equivocal, it should be treated, in interpreting the contract as used according to that understanding."

By its terms the licensee definitely committed and obligated itself to apply lubrication period markings to that type of speedometer for Ford cars commonly called Stewart Ford Speedometers, for that was the course, the anterior course, that it had pursued. The licensee might well engage itself to do this. Being the manufacturer of the speedometer referred to it could build it as it saw fit and could equip it as it might elect. The point is that it had the absolute control of the character of its own product.

This, however, is in contrast with its situation as to furnishing car manufacturers with a speedometer as standard equipment. As to this feature, by the terms of the supplemental license agreement, the licensee limited its obligation to that of only *soliciting* car manufacturers to *order* and *accept* the particular speedometer. Manifestly, this was all it had done and all it could do in the circumstances stated, because the manufacturer would be the sole authority to determine the character of the device which it desired for its car as standard equipment.

A mass of evidence consisting of oral testimony and letters has been introduced in this case through depositions, which, insofar as it varies the meaning of the written agreement, is wholly inadmissible.

In the case of *Moore* v. *Railway Co.*, 159 Va. 703, 167 S. E. 351, 356, is this statement: "Of course, if the meaning of the grants themselves were plain, the language clear and understandable, a judicial construction of them could have been obtained from their 'four corners,' without the aid of extrinsic evidence. If this were true, then it is quite apparent that the volumes of evidence taken was in' vain."

In accordance with the above decision we are of the opinion that the language of the supplemental license agreement is clear and understandable and that its meaning is plain, and therefore a judicial construction of the license agreement may be had without the aid of extrinsic evidence, except as has been hereinbefore pointed out.

Accordingly, we reverse the judgment of the trial court and direct a decree to be entered dismissing the plaintiff's bill.

*Reversed.*

GREGORY, J., dissenting.