# Wytheville

## Oakwood Smokeless Coal Corporation v. Alta Medie Meadows and Henry Meadows.

June 6, 1945.

Record No. 2912.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*F. H. Combs* and *William A. Stuart,* for the plaintiff in error.

*S. H. & Geo. C. Sutherland,* for the defendants in error.

Holt, J., delivered the opinion of the court.

By notice of motion for judgment, the plaintiffs, Alta Medie Meadows and Henry Meadows, set out that they are the owners in fee of certain lands in Buchanan county and that the defendant is the owner of mining rights on the land which adjoins them. That mine, they say, is now being operated and that before its operation they had access to and used water from a spring on their land, which water was in all respects wholesome and palatable. They say that now it has become polluted by drainage from this mine and unfit for human consumption. Damages are claimed. This issue was submitted to a jury. Plaintiffs recovered a verdict for $700, which verdict, over the objection of the defendant, was confirmed by the trial court and is now before us on a writ of error.

"It is agreed between counsel, and so stipulated and made a part of the record that both plaintiffs and defendant claim title under John K. Ratliff."

The defendant traces its title back to a deed of October 31, 1904, by and between John K. Ratliff, party of the first part, and E. K. Boyd, party of the second part, recorded April 14, 1906. In it for a valuable consideration Ratliff conveyed to Boyd the right to mine coal, oil and gas. In that deed this appears:

"Now, therefore, the party of the first part (John K. Ratliff) for and in consideration of the several sums of money paid and to be paid, does by these presents grant, bargain, sell and convey unto the party of the second part his heirs or assigns, all the coal, oil and gas on and underlying the following tract or parcel of land, and all the timber for mining purposes on thirty acres of land, under 16 inches in diameter which is standing on said lands at the time said second party may commence mining operations on said premises, together with the rights of ingress and egress through and over said lands for the purpose of mining and removing said coal, oil and gas, without leaving any sup-

port for the overlying strata, and also the right of ingress and egress, through and over said lands to remove the coal, oil and gas, which said second part or their assigns, may acquire, on *and* adjacent lands, and other usual mining privileges necessary for the full enjoyment of the premises hereby granted. The said tract of land on which the coal, oil and gas and mining rights and the timber on thirty acres, if standing when mined, * * * ."

The proposition before us in its simplest form is this:

Could Ratliff, if he were living and owned and used this spring, be heard to complain that it was damaged by drainage from this mine?

In due course, mining was begun, and at a point which seemed to the company's engineers suitable and convenient to its successful operation, a shaft was driven into the mountain.

Along the gallery in which coal is actually being dug runs a duplicate gallery with its separate opening on the surface. Into this duplicate gallery air is forced by fans and comes out where men are working; otherwise the air there would be what might be described as at "dead end" and would become stale and poisonous. This method of ventilation is common practice and is required by statute. See Code, section 1852.

Whenever for any cause ventilation becomes defective workmen must be instructed to withdraw immediately and may not return until ventilation has been restored. Code, section 1854.

A mining inspector is required to examine into the condition of the mine as to ventilation and drainage and to see that proper provision is made for them and for the general safety of the workmen. Code, section 1849.

In the instant case, Mr. St. Clair, a State mine inspector, upon inspection, found that the ventilation was bad. A necessary air shaft was installed under his direction and located at the place recommended by him. All that was done was done in due course of a mining operation and was

done for the safety of men working there and in accordance with statutory requirements.

The water in this case was percolating water, which dripped from the roof of the mine and flowed through this ventilating gallery in volume about sufficient to fill a two-inch pipe, and from the mouth of the mine ran by gravity down the mountain. It did not run directly into the spring but did seep into it in quantities sufficient to make it unpalatable.

The situation, so far as the rights of the parties are concerned, does not differ from what it would be if this water flowed by gravity along the floor of the mining shaft itself and down the mountainside instead of through an air gallery.

In the Ratliff deed, Boyd was given the right to remove coal, oil and gas without leaving any support for overlying strata, together with all other usual mining privileges necessary for the full enjoyment of the premises granted. In the notice of motion no complaint is made of the way coal was taken. Negligence charged is that the mining company collected polluted waters and discharged them in such manner that they reached and destroyed for all practical purposes a valuable spring. In this it differs from *Stonegap Colliery Co. v. Hamilton*, 119 Va. 271, 89 S. E. 305, Ann. Cas. 1917E, 60. There negligence rests upon the fact that the mining company left insufficient pillars or other support to prevent the overlying strata from breaking.

Judge Burks, then a court reporter, in a headnote to that case said:

"If, in mining in the usual and ordinary way, subterranean streams or percolations of water which feed a spring on the surface are intercepted, thereby causing the spring to sink or become dry, there is no liability therefor upon the owner and operator of the mine."

The same principles involved came before this court in *Couch v. Clinchfield Coal Corp.*, 148 Va. 455, 139 S. E. 314. It there appears that plaintiff's intestate was the owner of a two-acre tract of land on which he had sunk a well.

The defendant coal company owned and mined the coal thereunder and owned in fee and mined lands adjoining. On this adjoining land, when props were moved, the roof cracked. This well went dry and the land itself became less productive. By reason of what was done on the adjoining tract, percolating subterranean waters which had theretofore reached this well were intercepted. Plaintiff sought to recover damages. There was a verdict for the defendant, which this court sustained.

Plaintiff relied heavily upon *Stonegap Colliery Co.* v. *Hamilton, supra*. In that case Hamilton owned the surface of what was known as the Dodson tract, while the coal company owned the coal thereon. When pillars were withdrawn, the roof cracked and a spring went dry. A recovery was sustained. The court there gave this instruction:

"The court instructs the jury that the defendant had the right to mine and remove the coal under the tract of land in question known as the J. A. Dodson tract, and to take down such of the roof over said coal as was reasonably necessary in mining coal and removing same, and if in so doing it tapped the source of the spring on said tract of land and drained it, the defendant is not liable. But the jury are further instructed that it was the duty of the defendant in mining said coal to leave sufficient props, pillars or other means of support to prevent the overlying strata from breaking and falling; and if they believe that the defendant failed to leave sufficient props, pillars or other means of support for said overlying strata and that as a result of such failure it was cracked and broken and the spring on the said land thereby drained and destroyed, they should find for the plaintiff such damages as he sustained so that the same shall not exceed five thousand dollars."

These instructions were approved in *Couch* v. *Clinchfield Coal Corp., supra:*

"The court instructs the jury that if you believe from the evidence that plaintiff's well went dry on account of the mining and removal of coal by defendant or by reason of

cracks on an adjacent tract of land, then there can be no recovery in this case.

"The court instructs the jury that the defendant in the removal of its coal had the right under the law to drain underground or subterranean waters, streams, pools, or percolations in said soil over or around its seams of coal, and if in so removing its coal it drained the water in said well, it is not responsible or liable in damages to the plaintiff for the loss of his well."

*Yukon Pocahontas Coal Co.* v. *Ratliff,* 175 Va. 366, 8 S. E. (2d) 303, is a cause in which the plaintiff sought by a bill in chancery and by a declaratory judgment to have those rights adjudicated which passed to him under a deed from James M. Ratliff of date September 23, 1904. There the right to mine coal, oil and gas was conveyed to its predecessor in title. The grant was quite like that in the present case but goes more into detail as to the rights which the grantee took. Plaintiff further contended that "the mining and manufacture of the coal and minerals acquired, including the right to construct and maintain stores, warehouses, supply houses, miners' homes, hospitals, gardens and pastures for themselves and their employees, and rights of way for ingress and egress upon and below the surface of said land; * * * "

A demurrer was interposed and was sustained. This we reversed and the cause was remanded. That case again came before this court in *Yukon Pocahontas Coal Co.* v. *Ratliff,* 181 Va. 195, 24 S. E. (2d) 559.

It there appears that the plaintiff sought to enjoin the erection of hotels, miners' homes, etc., and charged that these structures constituted a cloud upon its title. An injunction was refused. The court said that as to whether or not they interfered with mining operations "is a question of fact to be determined from the evidence in each particular case," and that in each instance "there is excepted and reserved from the operation of this conveyance whatever mineral rights and privileges that have heretofore been conveyed."

In the course of its opinion, this statement is cited with approval from *Williams* v. *Gibson*, 84 Ala. 228, 4 So. 350, 5 Am. St. Rep. 368:

■ "The incidental rights of the miner which are appurtenant to the grant of the mineral, are to be gauged by the necessities of. the particular case, and therefore vary with changed conditions and circumstances. He may occupy so much of the surface, adopt such machinery and modes of mining and establish such auxiliary appliances as are ordinarily used in such business, as may be reasonably necessary for the profitable and beneficial enjoyment of his property. But he is not limited, as we have already said, to such appliances as were in existence when the grant was made, but may keep pace with the progress of society and modern inventions."

It is supported by *Marvin* v. *Brewster Iron Min. Co.*, 55 N. Y. 538, 14 Am. Rep. 322; *Wilms* v. *Jess*, 94 Ill. 464, 34 Am. Rep. 242; Bainbridge on Mines and Mining, 35, 62, 63.

Probably the leading case on this subject is *Pennsylvania Coal Co.* v. *Sanderson*, 113 Pa. St. 126, 6 A. 453, 57 Am. Rep. 445, where it is said:

■ "The right to mine coal is not a nuisance in itself. It is, as we have said, a right incident to the ownership of coal property; and when exercised in the ordinary manner, and with due care, the owner cannot be held for permitting the natural flow of mine water over his own land, into the watercourse, by means of which the natural drainage of the country is effected. There are, it is well known, percolations of mine water into all mines. Whether the mine be operated by tunnel, slope, or shaft, water will accumulate, and, unless it can be discharged, mining must cease. The discharge of this acidulated water is practically a condition upon which the ordinary use and enjoyment of coal lands depends. The discharge of the water is practically part and parcel of the process of mining; and, as it can only be effected through natural channels, the denial of this right must inevitably produce results of a most serious character

to this, the leading industrial interest of the state. The defendants were engaged in a perfectly lawful business, in which they had made large expenditures, and in which the interests of the entire community were concerned. They were at liberty to carry on that business in the ordinary way, and were not, while so doing, accountable for consequences which they could not control."

This statement of the law is from 27 Cyc. 700:

"Those things which are appurtenant to a mine will pass under a lease of the mine as a necessary part thereof, although not mentioned in the lease."

See also Devlin on Deeds, section 863.

In *Robinson* v. *South Penn Oil Co.*, 112 W. Va. 114, 163 S. E. 857, 858, it appears that salt water from an oil well was drained from the bottom of tanks and flowed as other waters do. Sheep drank it and were poisoned. The court held that it was *damnum absque injuria* and that the principle that one must so use his property as not to injure another had no application, since the right of the defendant to take oil was given by the plaintiff's predecessors in title.

In 36 Am. Jur. 402, in discussing where the right to mine had been separated from the surface, it is said:

"The implied right to occupy so much of the surface as may be needed to open and work the mines is not limited, but rather strengthened, by a special grant of certain timber and water privileges and of a right of way to and from mines."

From the same authority, p. 412:

"Mining operations, being a reasonable use of land, do not, in general, make one carrying on such operations liable because percolating waters are intercepted or drawn away so as to destroy or injure springs or wells belonging to the owner of the surface or of adjoining lands. There are some decisions to the contrary, which adhere to the doctrine of correlative rights in percolating waters."

In *Yukon Pocahontas Coal Co.* v. *Ratliff, supra*, Mr. Chief Justice Campbell said that the construction of deeds is to be gathered from the "four corners of the deed."

■ But it is also true that the language of a written contract should be construed strongly against the grantor. *Stonegap Colliery Co.* v. *Kelly,* 115 Va. 390, 79 S. E. 341, 48 L. R. A. (N. S.) 883. It there quotes with approval from *New York* v. *Interborough Rapid Transit Co.,* 125 App. Div. 437, 109 N. Y. S. 885:

" * * * the right of the lessee to use the demised premises for such collateral purposes as such property might be customarily used. A lessee of real property is entitled to the exclusive use of the demised premises for any purpose not prohibited by the lease, not amounting to waste or destruction of the subject matter. This is the general rule."

In a note to 148 A. L. R. 588 is this rule for the construction of written instruments:

■ "It has been stated as a general rule that where doubt exists as to the meaning of lease restrictions as to the use of property, such provisions are to be resolved in favor of the lessee and against the lessor. *Mutual Paper Co.* v. *Hoague-Sprague Corp.* (1937), 297 Mass. 294, 8 N. E. (2d) 802; *Otting* v. *Gradsky,* 294 Ky. 779, 172 S. W. (2d) 554."

■ When the coal company's predecessors were given the right to mine coal, they were given those usual mining privileges necessary for the full enjoyment of this mining right. Defendant here could not dig a ditch and carry this percolating water to the plaintiffs' spring. It had the right to bring it by gravity to the mouth of the mine and there let it flow where gravity took it.

Plaintiffs took their land with this burden, and the injury which they suffered is *damnum absque injuria.* We have seen that their right is a right which Ratliff retained after the deed to Boyd. They could only recover if Ratliff could were he still the owner.

Suppose, by analogy, Ratliff had owned a plantation and had given one a right to build a dam across a hollow and impound water for a grist mill. If its race had overflowed a spring and had rendered it unfit for domestic use, could Ratliff have recovered damages? To state that proposition is to answer it.

In a case like this conflicting titles must have had a common source before the principle of *sic utere tuo* can be involved. The right to mine coal without the right to drain the mine is no right at all.

No riparian rights are involved.

The defendant further contends that even if it were to admit for the sake of argument that it did not take in the deed from Boyd the rights for which it now contends, it afterwards secured those rights in a deed of the Page Pocahontas Coal Corporation to the Yukon Pocahontas Coal Corporation of date June 30, 1938, recorded October 3, 1938, in which additional rights are conferred.

In the deed of September 20, 1935, the Page Pocahontas Coal Corporation took an undivided 6/10th interest in 134.6 acres of land. This was partitioned in the deed of March 14, 1936. Henry Meadows took 42 acres of land and Margaret Vance two acres of land, and the Page Pocahontas Coal Corporation got the remainder, which included the spring. And this is conveyed to the Yukon Pocahontas Coal Company by deed of date June 30, 1938.

The deed from the Page Pocahontas Coal Corporation to the Yukon Pocahontas Coal Corporation contained these provisions which the defendant relies upon:

"And the said parties of the first part, in connection with said coal, oil, gas, minerals and other metals, hereby give and grant unto the said parties of the second part the exclusive right and privilege (for the purpose of mining and removing said coal, oil, gas, minerals and other metals) of entering upon said lands and occupying and using so much of the surface thereof as may be necessary or convenient to use in the mining, manufacturing, transporting and removing therefrom, or utilizing thereon the said coal and products of coal, as well as the same from any other lands including the right to erect and maintain thereon inclines, slopes, tipples, shutes, houses for employees with reasonable grounds for gardens, commissaries, power houses and anything and all other buildings, and to erect telegraph and telephone lines and lines for the transmission of electric power, and also the

right to place on said land all other buildings, structures and equipment which may be necessary or convenient in connection with the mining and removing of said coal, oil, gas, minerals, or other metals, and the right of dumping waste thereon without regard to the source of such waste, and the right of building and maintaining and operating tramways, railroads and other roads, over, across and through said lands, and the right and privilege of using such stone, sand and water thereon, as may be necessary or convenient to use in mining and removing the said coal, oil, gas, minerals, and metals, and the right to use so much of the timber on said land as may be needed and necessary in mining and removing the coal, oil, gas, minerals, and other metals from said lands, together with the sole and exclusive privilege of selling merchandise on the said land and the right of cokeing the said coal and making and manufacturing the said coal into any part of products or by-products that may be desired by the said lessee, its successors or assigns."

The plaintiffs in reply say that the deed of September 30, 1938, to Alta Medie Meadows was executed before the foregoing deed was recorded. In answer to that claim the defendant contends that the deed of September 30, 1938, is but a quit claim deed and was not notice to it when the deed containing these additional provisions was executed. *Virginia, etc., Iron Co.* v. *Fields*, 94 Va. 102, 26 S. E. 426.

These gentlemen disquiet themselves in vain. Drainage is not mentioned as among additional rights conferred; and for this reason: It is fundamentally inherent where a mine owner is given the right to "all other usual mining privileges necessary for the full enjoyment of the premises hereby granted."

To have given it in the deed of June 30, 1938, would have been but to give again what had already been given. It already had "all other usual mining privileges necessary for the full enjoyment of the premises hereby granted."

For the reasons stated, the judgment of the court below must be reversed, and it is so ordered.

*Reversed and dismissed.*