Present: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
Agee,[*] JJ., and Carrico, S.J.

NEXTEL WIP LEASE CORPORATION

v.  Record No. 071653

ROSCOE NEAL SAUNDERS,
EXECUTOR OF THE
ESTATE OF CORA BELL MEADOR
SAUNDERS, ET AL.

                                        OPINION BY
                            SENIOR JUSTICE HARRY L. CARRICO
                                   September 12, 2008

TOWERCO LLC

v.  Record No. 071655

ROSCOE NEAL SAUNDERS,
EXECUTOR OF THE
ESTATE OF CORA BELL MEADOR
SAUNDERS, ET AL.


              FROM THE CIRUIT COURT OF BEDFORD COUNTY
                   James W. Updike, Jr., Judge

     The issue in these appeals is whether the lease of a parcel

of land atop a mountain in Bedford County permits the erection

of one telecommunications tower or two such towers.  In a

declaratory judgment proceeding, the circuit court held that the

lease permitted only one tower.  We agree with the circuit court

and will affirm its judgment.

_____

       [*] Justice Agee participated in the hearing and decision of
this case prior to his retirement from the Court on June 30,
2008.

The parcel of land, measuring approximately 50' by 50', is part of a larger tract owned by Roscoe Neal Saunders and Ralph Edward Saunders, Executors of the Estate of Cora Bell Meador Saunders (the Saunders). In an Option and Ground Lease Agreement dated July 13, 2004 (the lease agreement), the Saunders, as lessors, leased the parcel to Nextel WIP Lease Corporation (Nextel), as lessee, for a term of five years, with five successive five-year options to renew for a monthly rental of $670.00.

Nextel constructed an 80' high telecommunications tower on the property and then on June 30, 2005, assigned the lease to TowerCo, LLC (TowerCo), as the lease agreement permitted. In March 2006, an application was filed with the Bedford County Department of Planning for an amended special use permit to allow TowerCo to increase the height of the 80' tower to 100 feet. Another application was filed for a special use permit to allow the construction of a second 80' tower on the leased premises. On April 24, 2006, the County's Board of Supervisors denied the application to increase the height of the existing tower because a zoning regulation forbade any height above 80 feet. However, the Board approved the construction of a second 80' tower on the leased premises.

Construction was begun on the new tower, and on September 12, 2006, Nextel and TowerCo were confronted with a motion for

declaratory judgment filed by the Saunders in the circuit court. The motion alleged that the "lease provided for the construction of one communication tower on the lease[d] premises" but "the lessee and its assignees have commenced construction of a second tower on the lease[d] premises contrary to the provisions of the lease agreement and has [sic] refused to forego construction upon confrontation by the plaintiffs." The Saunders prayed that the circuit court "determine the number of towers permitted pursuant to the aforementioned Lease Agreement dated July 13, 2004."

Nextel and TowerCo filed answers to the motion for declaratory judgment and also filed motions for summary judgment. Nextel alleged in its motion that it was entitled to summary judgment because there were no material facts in dispute and "the Lease at issue is unambiguous, and it clearly allows Nextel and its assignees to build a second telecommunications tower on the Premises." In its motion, TowerCo alleged that it was entitled to summary judgment "because the only issue to be resolved is a question of law – interpretation of three clear and unambiguous provisions of the Lease Agreement" expressing the parties' intent "that more than one tower may be constructed on the Leased Premises."

The three paragraphs referenced by TowerCo provide in pertinent part as follows:

3

10.  Use.  The premises may be used by Lessee for the transmission and receipt of wireless communication signals in any and all frequencies and the construction and maintenance of *towers*, antennas, or buildings, and related facilities and activities ("Intended Use").  Lessor agrees to cooperate with Lessee in obtaining, at Lessee's expense, all licenses and permits required for Lessee's use of the Premises (the "Governmental Approvals").  Lessee may construct additional improvements, demolish and reconstruct improvements, or restore replace and reconfigure improvements at any time during the Initial Term or any Renewal Term of this Lease.  [Emphasis added.]

14.  Lessor's Representations and Warranties.  Lessor represents and warrants that (i) Lessee's Intended Use of the Premises as a site for the transmission and receipt of wireless communication signals; for the construction and maintenance of *towers*, antennas or buildings; and related facilities is not prohibited by any covenants, restrictions, reciprocal easements, servitudes, subdivision rules or regulations.  [Emphasis added.]

17.  Improvements; Utilities; Access.  (a) Lessee shall have the right, at Lessee's sole cost and expense, to erect and maintain on the Premises improvements, personal property and facilities, including without limitation, *one (1) tower*, a structural tower base, radio transmitting and receiving antennas, communications equipment, an equipment cabinet or shelter and related facilities.  [Emphasis added.]

The circuit court heard oral argument on the motions for summary judgment and denied them, holding that the lease agreement was ambiguous and that parol evidence would be admissible to determine the parties' intent when the lease was negotiated.  At the conclusion of an ore tenus hearing held for the taking of parol evidence, the circuit court ruled in its final order that "said Lease Agreement permits the construction of one communication tower, and only one communication tower, on

4

the leased premises."  We awarded Nextel and TowerCo each an appeal.

We first must clarify the record.  During oral argument before this Court, counsel for TowerCo made an argument based upon our decision in Scott v. Walker, 274 Va. 209, 645 S.E.2d 278 (2007), decided after the present case was decided in the circuit court.  There, we held that a restrictive covenant providing that no lot in a subdivision "shall be used except for residential purposes" was ambiguous and did not prevent the lot's owners from leasing their single-family dwelling by the day or by the week.  We stated as follows:

> It is . . . the general rule that while courts of equity will enforce restrictive covenants where the intention of the parties is clear and the restrictions are reasonable, they are not favored, and the burden is on him who would enforce such covenants to establish that the activity objected to is within their terms.  They are to be construed most strictly against the grantor and substantial doubt or ambiguity is to be resolved in favor of the free use of property and against restrictions.

274 Va. at 212-13, 645 S.E.2d at 280 (quoting Schwarzschild v. Welborne, 186 Va. 1052, 1058, 45 S.E.2d 152, 155 (1947)).

We also said there is an exception, as follows:

> [I]f it is apparent from a reading of the whole instrument that the restrictions carry a certain meaning by definite and necessary implication, then the thing denied may be said to be clearly forbidden, as if the language had been in positive terms of express inhibition.

Scott, 274 Va. at 213, 645 S.E.2d at 280-81 (quoting Bauer v.
Harn, 223 Va. 31, 39, 286 S.E.2d 192, 196 (1982) (internal
quotation marks omitted)).

In oral argument before us, TowerCo claimed that the circuit court held that paragraph 17(a) of the lease agreement, containing the "one (1) tower" language, was ambiguous. Therefore, counsel argued, the circuit court should have construed the paragraph in favor of the free use of the property and against any restriction as a matter of law, thus barring the court from admitting parol evidence or drawing necessary implications. When asked whether this argument had been made in the circuit court, counsel for TowerCo answered affirmatively and named three places in the record where the argument would appear. We have yet to find any argument based upon a purported holding by the circuit court that paragraph 17(a) was ambiguous. We will not, therefore, consider TowerCo's argument. Rule 5:25.

However, while the circuit court did not hold paragraph 17(a) ambiguous, it did, as noted above, hold the lease agreement ambiguous, and that ambiguity alone will serve as the focus of our analysis. Whether contractual provisions are ambiguous is a question of law and not of fact, and we do not on appeal accord the circuit court's resolution any deference since we are afforded the same opportunity to consider the provisions. Video Zone, Inc. v. KF&F Properties, L.C., 267 Va. 621, 625, 594

S.E.2d 921, 923 (2004).  Thus, we conduct a de novo review.
Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631,
561 S.E.2d 663, 667 (2002).

Contractual provisions are ambiguous if they may be
understood in more than one way or if they may be construed
to refer to two or more things at the same time.  Berry v.
Klinger, 225 Va. 201, 207, 300 S.E.2d 792, 796 (1983).  The
ambiguity, if it exists, must appear on the face of the
instrument itself.  Salzi v. Virginia Farm Bureau Mut. Ins.
Co., 263 Va. 52, 55, 556 S.E.2d 758, 760 (2002).  In
determining whether the provisions are ambiguous, we give
the words employed their usual, ordinary, and popular
meaning.  Pocahontas Mining, L.L.C. v. Jewell Ridge Coal
Corp., 263 Va. 169, 173, 556 S.E.2d 769, 772 (2002).  And
contractual provisions are not ambiguous merely because the
parties disagree about their meaning.  Dominion Savings
Bank, FSB v. Costello, 257 Va. 413, 416, 512 S.E.2d 564,
566 (1999).

In addition to Scott v. Walker, Nextel and TowerCo rely
heavily upon Parrish v. Robertson, 195 Va. 794, 80 S.E.2d 407
(1954), Oakwood Smokeless Coal Corp. v. Meadows, 184 Va. 168, 34
S.E.2d 392 (1945), and Stonegap Colliery Co. v. Kelly, 115 Va.
390, 79 S.E. 341 (1913).  In Parrish, we stated as follows:

7

> In . . . an instrument, where uncertainties or ambiguities exist, the tenant is favored by law . . . because the landlord, having the power of providing expressly in his own favor, has neglected to do so; and also upon the general principle that every man's grant is to be taken most strongly against himself. Thus, the language of a lease which is fairly susceptible of two constructions is to be taken most against the lessor.

195 Va. at 800, 80 S.E.2d at 410-11 (citations and internal quotation marks omitted).

In Oakwood Smokeless Coal Corp., we stated as follows:

> A lessee of real property is entitled to exclusive use of the demised premises for any purpose not prohibited by the lease, not amounting to waste or destruction of the subject matter.
>
> . . . .
>
> It has been stated as a general rule that where doubt exists as to the meaning of lease restrictions as to the use of property, such provisions are to be resolved in favor of the lessee and against the lessor.

184 Va. at 177, 34 S.E.2d at 396 (citations and internal quotation marks omitted).

And in Stonegap Colliery Co., a case Nextel says is controlling, we stated as follows:

> A covenant that premises shall be used by a lessee for a particular specified purpose does not impliedly forbid that they may be used for a similar lawful purpose which is not injurious to the landlord's rights, unless such other use is expressly forbidden.

115 Va. at 394, 79 S.E. at 342.

Nextel and TowerCo argue that the provisions of the lease are not ambiguous. They say that paragraphs 10 and 14, which permit "towers," are consistent with and not

8

contradictory of paragraph 17(a), which permits "improvements . . . including without limitation, one (1) tower," indicating, as Nextel puts it, that the lease provides the lessee with "the right to construct *a minimum of* one tower on the Premises," or, as TowerCo puts it, that "there simply is no basis to either ascribe ambiguity to the provision or construe the provision as limiting use of the leased property to the construction of one tower only."

Nextel and TowerCo contend that the word "including," found in paragraph 17(a), implies that the list following is not exhaustive and not exclusive. They cite several cases for definitions of the word to support their claim that the provision "including without limitation, one (1) tower" unambiguously permits the erection of more than one tower on the leased premises. For example, in Federal Election Comm'n v. Mass. Citizens for Life, Inc., 769 F.2d 13 (1st Cir. 1985), aff'd, 479 U.S. 238 (1986), the United States Court of Appeals for the First Circuit stated that "the word 'includes' is usually a term of enlargement, and not of limitation," and therefore "conveys the conclusion that there are other items includable, though not specifically enumerated." Id. at 17. Also cited is Black's Law Dictionary, 777 (8th ed. 2004) ("including typically indicates a partial list").

We are willing to adopt these definitions of the word "including," but we do not agree that as used in paragraph 17(a) the word has the effect Nextel and TowerCo claim for it. In the context in which it appears, the "including without limitation" language means that there could be no limitation upon the maintenance, use, or improvement of the one tower listed in paragraph 17(a). Nor could there be any limitation upon the addition of some different item not specifically enumerated that might be necessary or convenient to the erection, maintenance, use, or improvement of that one tower.

Furthermore, the "including without limitation" language certainly does not require us to ignore that the "usual, ordinary, and popular meaning" of the word "one," appearing in paragraph 17(a), is "one," not "two." See Pocahontas Mining, 263 Va. at 173, 556 S.E.2d at 772. However, we cannot view paragraph 17(a) in isolation but must consider it along with all the other provisions of the lease. Berry, 225 Va. at 208, 300 S.E.2d at 796 (contract "must be read as a single document" and its meaning "is to be gathered from all its associated parts").

In this approach, paragraphs 10 and 14 come into play. Paragraph 17(a) may be understood as permitting only one

tower while paragraphs 10 and 14 may be understood as permitting more than one. Thus, there is an unmistakable ambiguity in the provisions of the lease agreement. The question then becomes how the ambiguity should be resolved.

TowerCo argues that "rather than admitting parol evidence, the trial court should have considered whether 'settled rules of interpretation, applied to the writing as a whole, leave a genuine uncertainty as to which [of] two or more possible meanings represents the contracting parties' true intent. Thus, if the words chosen by the parties have an ordinary, plain meaning, the parol evidence inquiry is ended; parol evidence is inadmissible.' "

The difficulty, however, is that it is impossible to ascertain from a consideration of the lease agreement as a whole which of the two possible meanings represents the true intent of the parties. In the effort to ascertain the appropriate meaning, Stonegap Colliery Co. is helpful, but not to the position espoused by Nextel and TowerCo.

In Stonegap Colliery Co., this Court considered an abundance of extrinsic evidence. At issue was a claim by a lessor that a lease of land for the purpose of mining coal thereon impliedly prohibited the construction of housing for miners on a part of the land unusable for mining

11

purposes.  The Court stated that it "appears from the testimony of numerous coal operators . . . that it is usual and customary for the lessee to have the possession, control and use of the surface of the leased premises . . . for all purposes," including "tenement houses."  115 Va. at 395-96, 79 S.E. at 343.  The Court also stated that "the action of the parties is significant as showing their intention, and that the construction of the lease now contended for by the [lessors] is not warranted."  Id. at 396, 79 S.E. at 343.  The Court then proceeded to recite a lengthy list of activities supporting the view that construction of the housing for miners was a use intended by the parties.  Id. at 396-97, 79 S.E. at 343.

In Dart Drug Corp. v. Nicholakos, 221 Va. 989, 277 S.E.2d 155 (1981), we indicated that when a case involves the construction of covenants requiring strict construction and the provisions are ambiguous, "the intention of the parties is the controlling factor" and extrinsic evidence is admissible to discern that intention.  Id. at 993, 277 S.E.2d at 157.  In a number of other cases involving ambiguous contractual provisions, we have approved the use of extrinsic evidence to resolve the ambiguity.

As recently as this past January, in <u>Ott v. L&J</u> <u>Holdings, LLC</u>, 275 Va. 182, 654 S.E.2d 902 (2008), we said that "[w]hen a document is ambiguous, . . . the court will look to parol evidence in order to determine the intent of the parties." <u>Id.</u> at 187, 654 S.E.2d at 905. In <u>Prospect</u> <u>Dev. Co. v. Bershader</u>, 258 Va. 75, 515 S.E.2d 291 (1999), we said that "'where the writing on its face is ambiguous, . . . parol evidence is always admissible . . . to establish the real contract between the parties.' " <u>Id.</u> at 84, 515 S.E.2d at 296. And in <u>Cascades North Venture Ltd.</u> <u>P'ship v. PRC Inc.</u>, 249 Va. 574, 457 S.E.2d 370 (1995), we said that "where the writing on its face is ambiguous, . . . the court should receive extrinsic evidence to ascertain the intention of the parties." <u>Id.</u> at 579, 457 S.E.2d at 373. <u>See</u> <u>also</u> <u>Video Zone</u>, 267 Va. at 626, 594 S.E.2d at 924; <u>Tuomala v. Regent University</u>, 252 Va. 368, 374-75, 477 S.E.2d 501, 505 (1996); <u>Georgiades v. Biggs</u>, 197 Va. 630, 634, 90 S.E.2d 850, 854 (1956); <u>Young v.</u> <u>Schriner</u>, 190 Va. 374, 379, 57 S.E.2d 33, 35 (1950); <u>Shockey v. Westcott</u>, 189 Va. 381, 389, 53 S.E.2d 17, 20 (1949); <u>Stewart-Warner Corp. v. Smithey</u>, 163 Va. 476, 487, 175 S.E. 882, 886 (1934).

We hold that the trial court did not err in admitting parol evidence. We will now consider that evidence,

viewing it in the light most favorable to the Saunders, who prevailed at trial.  Tuomala, 252 Va. at 375, 477 S.E.2d at 505.

The record shows that on some unspecified date, a representative of Nextel approached the Saunders brothers and told them that Nextel was interested in the mountain on their property "because of its height for *a* telecommunications tower."  (Emphasis added.)  Later, over a period of several months beginning in the summer or autumn of 2003, the Saunders negotiated numerous times with as many as five or six different representatives of Nextel.

A summary of the matters that the Saunders and Nextel's representatives negotiated is important for it is indicative of their intentions at the time they signed the lease agreement.  Ultimately, Nextel presented the Saunders with a draft of a lease agreement, included in the record as Exhibit A.  Ralph Saunders, with the agreement of his brother, Roscoe, made numerous changes in the draft, including in paragraph 18(a), which is now paragraph 17(a).

Originally, paragraph 18(a) provided in part that "Lessee shall have the right, at Lessee's sole cost and expense, to erect and maintain on the Premises improvements, personal property and facilities, including

14

without limitation, towers." However, the Saunders struck through the words "including without limitation," struck the "s" from the end of the word "towers," and placed "1-" before the new word "tower."

Roscoe Neal Saunders testified that these changes were made because "we figured . . . it needed to be with limitations," and where on "the original it says towers . . . we changed that over to one because negotiating on one tower was all that Nextel was doing at that point . . . one tower only . . . [o]ne tower was negotiated." And, significantly, when Roscoe Saunders was asked "how many towers did Nextel represent to you was going to be built up there," he replied: "One only." And he affirmed that Paul Tobias, a Nextel representative, "said during the negotiations that they were planning on building one tower on the property."

On cross-examination, Roscoe Saunders was asked whether he had discussed with anyone on behalf of Nextel concerning the possibility that Nextel would construct more than one tower. He responded that there was not a discussion but only a mention by a Nextel representative that there "may be a possibility but he didn't think so" and "it was not discussed as a possibility of a contract."

15

Later on, Nextel asked the Saunders to return the "including without limitation" language to the lease agreement. A Nextel representative explained that the return was necessary to allow Nextel to upgrade its equipment and "lease part of [its] tower to . . . someone else," and the removal of the language "would have stopped [it] from doing so." Accordingly, Roscoe Saunders testified, "we put that back into the contract for that reason."

The Saunders then received from Nextel another draft of the lease agreement, included in the record as Exhibit B. This draft returned the "including without limitation" language to the text of what then became paragraph 17(a), but, significantly, Nextel included in paragraph 17(a) the "one (1) tower" change the Saunders had made in Exhibit A. As Ralph Saunders put it in his testimony, "they brought [the draft] back with the one wrote in it."

This draft became the final lease agreement without further change. This agreement and a memorandum of agreement were signed by the Saunders on July 2, 2004. Before signing, they saw attached to the memorandum a "blueprint drawing of one tower and its equipment."

16

The Saunders learned in notices from Bedford County dated March 3, 2006, that TowerCo had filed applications for an amended special use permit to increase the height of the existing tower from 80' to 100' and for a special use permit to construct a second tower.  Roscoe Saunders attended the first hearing on the applications and opposed the second tower but did not oppose increasing the height of the existing tower.

The Saunders' counsel also sent a letter to TowerCo stating that his clients "do not want the obstruction of another tower on the skyline or the additional burden on the road."  Counsel concluded with the statement that if TowerCo considered "another tower a necessity, it may be that these issues could be addressed in negotiation."  No negotiation ensued, and the Saunders filed their motion for declaratory judgment.

In their case in chief, Nextel and TowerCo each called only one witness.  Nextel called Marsha Monique Fruit, its project manager for southern Virginia and all of West Virginia.  However, Nextel does not mention Fruit's name or set forth any of her testimony in either its opening brief or its reply brief.  The same is true of the one witness TowerCo called, its co-location manager, Martha Province,

17

whose job was to lease space on towers that TowerCo owned. We must assume, therefore, that Nextel does not intend to rely on Fruit's testimony on appeal and that TowerCo does not intend to rely on Province's.

TowerCo did mention Fruit's name in one of its briefs and advanced an argument based upon her testimony. TowerCo quoted Fruit as having testified that "the Lease contained nothing to restrict the 'use of the property at all . . . in particular the number of towers'" and that "a one-tower restriction would have caused her to flag the Lease as a 'non-standard' Lease."

However, there is a problem with Fruit's testimony. The evidence showed that five or six Nextel representatives negotiated with the Saunders, but Fruit admitted that she did not "participate directly" in the negotiations with the Saunders, and she did not claim that she was present during any discussion between them and any other Nextel representative.

Furthermore, Fruit denied ever having seen Exhibit A, the draft of the lease agreement the Saunders returned to Nextel "all marked-up," and she disavowed knowing anything about paragraph 18(a), now paragraph 17(a), "where it has marked out towers and going into one tower." Her testimony

18

was insufficient, therefore, to contradict the testimony of the Saunders that they and Nextel's representatives negotiated for only one tower or to show that the change in paragraph 17(a) from "towers" to "one (1) tower" did not reflect the true intent of the parties.

In the end, under cross-examination, all Fruit could say was she knew that anything in the lease agreement limiting the number of towers would be "non-standard."  But this is beside the point.  The point is that, standard or not, Nextel kept the "one (1) tower" provision in Exhibit B, the final version that it prepared of the lease agreement and that was signed by the parties.

Finally, we must address a contention made by TowerCo that "[a]t best, the evidence at trial points only to what was in Lessors' heads contrary to both Nextel's understanding and the language of the Lease, which represents what the parties bargained for and agreed to." However, there is the evidence of Nextel's first contact with the Saunders, when its representative told them Nextel was interested in their mountain for "a," meaning one, "tower," there is the evidence that the Saunders and Nextel's representatives negotiated for only one tower, and there is the evidence of the representation made by a

Nextel representative that only one tower would be built, all uncontradicted and all showing what was in the "heads" not only of the lessors but of the lessee's personnel as well.  It is this evidence, coupled with the evidence of Nextel's retention of the "one (1) tower" language in the lease agreement, that truly "represents what the parties bargained for and agreed to."

We hold that the circuit court did not err in denying the motions for summary judgment and in holding that the lease agreement "permits the construction of one communication tower, and only one communication tower." Accordingly, we will affirm the circuit court's judgment.

<u>Affirmed</u>.