**In the Matter of BRADA MILLER FREIGHT SYSTEM, INC.**

**Bankruptcy No. 80–04099.**

United States Bankruptcy Court,
N. D. Alabama, S. D.

Dec. 22, 1980.

Jerry W. Schoel, Charles L. Denaburg, and Ben L. Zarzaur, Birmingham, Ala., for debtor.

David L. Uelmen, Alan M. Levy, Gerry M. Miller, Milwaukee, Wis., and Wilbur G. Silberman, Birmingham, Ala., for Local Unions.

Richard G. McCracken, Indianapolis, Ind., for Local Unions.

Anton Hajjar, Peter Winkler, Washington, D. C., for N. L. R. B., intervenor.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEPHEN B. COLEMAN, Bankruptcy Judge.

This cause came on to be heard on the application of Brada Miller Freight System, Inc. for approval of the Debtor's rejection of its Collective Bargaining Agreement with the Local Unions of the International Brotherhood of Teamsters, and on the appearance of Jerry W. Schoel, Charles L. Denaburg, and Ben L. Zarzaur, attorneys

for the Debtor; David L. Uelmen, Alan M. Levy, Gerry M. Miller, and Wilbur G. Silberman, attorneys for the Local Unions; Richard B. McCracken, attorney for Local Unions; and Anton Hajjar, attorney for the National Labor Relations Board, Intervenor, and on subsequent hearings at which appeared all of the above parties, including Peter Winkler for the National Labor Relations Board, and

The Court having heard and considered all the testimony submitted at the hearings had on August 28 and August 29, September 4 and September 5, October 20 and December 11, 1980, and having considered the application, and the objections of the National Labor Relations Board and the Local Unions to the rejection of the contracts, the entire record, proceedings, briefs, and argument of counsel, based on various hearings, and on the continued and on-going proceedings before the Court, the Court finds:

## FINDINGS OF FACT

Brada Miller Freight System, Inc. and Brada Miller, Inc. each filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on August 1, 1980.

Brada Miller Freight System, Inc., on August 5, 1980, applied to this Court for an order permitting it to reject certain executory contracts under Section 365 of the Bankruptcy Code, including but not limited to its Collective Bargaining Agreement with Local Unions of the International Brotherhood of Teamsters, which were entered into by the Debtor for a period to extend from April 1, 1979, to March 31, 1982.

On August 5, 1980, this Court entered an order confirming the rejection by the Debtor-in-Possession, without a formal hearing, of such contracts under Section 365 of the Bankruptcy Code.

On August 15, 1980, upon the application of the Local Unions, this Court voided and set aside the order of August 5, 1980, insofar as it confirmed rejection of the Collective Bargaining Agreement and set the matter for hearing on August 28, 1980.

Hearings were held on August 28 and 29 and September 4 and 5 on Debtor's application to reject the Collective Bargaining Agreement.

The National Labor Relations Board moved to intervene, and the motion to intervene was granted by this Court at the hearing held on the issue of rejection of the Collective Bargaining Agreement, under F.R.C.P. 24(b).

The contracts sought to be rejected cover the Company's employees in two categories: the owner-operators and local cartage drivers. These two categories of drivers comprise virtually all of the Company's employees.

## EMPLOYEE BENEFITS UNDER THE UNION CONTRACT

The employees of this Freight Line enjoyed many fringe benefits in addition to wages from this Company through representation by the Teamsters Union. The Health and Welfare Fund consists of the Company paying $36.50 a week per employee. The Pension Fund is $46.00 a week per employee. This is paid regardless of the number of hours worked by the employee. The employees are entitled to ten days holiday at an eight hour a day hourly rate. There is a maximum of three days funeral leave and there are five days sick pay.

There are two types of employees. One is called an owner-operator who owns a piece of equipment and drives it himself. He receives three percent of the gross revenue. The other type of employee is called City or Terminal Drivers. These drivers make $10.53 an hour wage, plus $0.95 cost of living, totaling $11.48 per hour. All these employees receive the same benefits as well as vacation pay. It cost the Company around $500,000 to maintain the City Drivers.

Brada Miller subscribes to the Motor Carrier Labor Advisory Counsel for the purpose of representing it at Union hearings or negotiating at $14,500. The expense of the officers to go to labor hearings is around $14,000. The average number of grievance

hearings is three to four per month. Additional office personnel must be maintained to handle a check off for the individual locals. Health, Welfare and Pension Reports must be filed and a two check system maintained. Testimony from the two main officers of Brada Miller maintained that the Company must generate $32,000 per day to service the Union Contract.

## FINANCIAL CONDITION OF THE DEBTOR FROM THE TESTIMONY

It is not the best of times for the trucking industry. Six carriers have either closed or gone into bankruptcy within the past year. General Motors has laid off 18,000 employees due to the automotive slowdown. Brada Miller's market area is the automotive industry. The Steel Corporations are experiencing a slowdown. This means less loads for the Debtor to haul.

Brada Miller employees were on strike from the end of March to mid May because the Collective Bargaining Agreement had expired. There was a marked decrease in business after this.

The month of July is notorious for plant closings and inventories and closing for vacations which contributed to a more gradual decrease in volume.

When the petition under Chapter 11 was filed on August 1, 1980, the total liabilities were approximately $7,887,000 with assets of approximately $3,747,000. The unsecured liabilities of Brada Miller Freight System, Inc. is $5,000,000. Brada Miller, Inc. borrowed $1,000,000 from Massachusetts Mutual as part of the purchase price of Brada Miller Freight System, Inc. On August 1, 1980, the Company had $287,096 in cash. On September 1, 1980, the Company had $20,000–$30,000 in cash. The accounts receivables on August 1, 1980, were $1,700,000. On September 1, 1980, they were $1,100,000. There was a net loss of $188,000 for 1979.

Additional testimony, and a statement of operating expenses, at the October 20th hearing showed a net loss from operations for August of $69,823 and $35,282 for Sep-

tember. This testimony, together with that of Mr. Cooper, that the break even point would require gross receipts of at least $49,676 per day; whereas the receipts from operations continued to be $35,000 per day or less, prompted this Court to order appointment of a Trustee for the protection of creditors.

Immediately prior to August, the Debtor was operating 225 motorized units on a daily basis. As of the 28th of August the number of units had diminished to approximately 125.

## HISTORY OF BRADA MILLER

Brada Miller Freight System, Inc. is a wholly owned subsidiary of Brada Miller, Inc. which is in turn owned by A. Dean Cutsinger. Mr. Cutsinger has owned Brada Miller since January 1, 1979.

Before Mr. Cutsinger owned the Company, Mr. Art Belford owned the System from 1974 to 1979, approximately five years. Under his leadership, while under Union Contracts, Brada Miller had over 550 motorized units and generated approximately $44,000,000 gross revenue per annum in 1978. Daily gross revenues reached $180,000 per day.

After Mr. Cutsinger purchased Brada Miller, he moved the general offices to Birmingham, Alabama where the payroll, accounting and billing functions, together with the administrative offices and the central dispatch were located. However, the bulk of the Company's business of 29 terminals is located in the Midwest.

Prior to filing Chapter 11, Brada Miller accomplished a changeover from Union to non-Union operation by forcing its employees to accept an independent contract as indicated by the testimony of Harold Mathena:

"Q. What did you tell your terminal managers?

A. Primarily that we were going into Chapter 11 and we made some provisions for continuing to operate.

Q. Now what did you tell them that you made on those provisions to continue to operate?

A. I told them that our provisions to continue to operate would be on the basis of an independent contract.

Q. So that on August 1st you told the terminal managers that Brada Miller was going to operate as a company with independent contractors?

A. Yes, sir.

Q. And that it was going to cancel its union contract?

A. I told them that the bankruptcy proceeding would cancel the union contract.

Q. The bankruptcy proceeding would cancel the union contract, is that right?

A. Yes, sir.

Q. And that you were going to operate nonunion from that point on?

A. I told them we were going to operate under an independent contract arrangement.

Q. Did you tell your terminal managers to have meetings with their stewards from the union?

A. Made some provision for interim leases to go in the equipment and did ask them to discuss the matter with the drivers.

Q. Now when you talk about the interim leases, are you talking about the lease that's currently being used?

A. Currently being exercised in some instances.

Q. Where did you get the interim lease?

A. Our Director of Safety and Personnel made some changes to form an internal form that we call a Trip Lease Agreement and that gave us an interim lease or a temporary lease."

## CONCLUSIONS OF FACT

The Court finds that one of the purposes of filing Chapter 11 was to eliminate the cost of the Union Contract. That was not necessarily the sole purpose, for the Company was and is in dire financial straits. It is now attempting to operate on such a narrow cash margin, from day to day, that it frequently has less than $500 reserve, after paying the bare operating costs to the drivers for the day's business. It is obvious that the Company cannot survive without additional and new capital.

The following conclusions are inescapable:

1. The Company did attempt to break the Union Contract and to use Section 365 of Title 11 for this purpose.

2. Neither side has attempted to enter into any kind of Collective Bargaining or negotiations. The Debtor has been too preoccupied with saving its financial life and the Union was caught by surprise by the filing of this case in the Northern District of Alabama, far from the Local's home base.

3. It is obvious that the Debtor is guilty of an "unfair labor practice" and there is no need to hold long and expensive hearings before the National Labor Relations Board because this Court can determine this from the evidence submitted in this case. The Company is too weak and infirm to sustain life from prolonged litigation. There are no funds or resources available for lawyers and litigation, and the Court is unwilling to spend creditors' money, which includes principally wage claims of 500 employees in the total sum of $500,000, for wasteful and fruitless lawsuits.

4. A Trustee has been appointed and is now seeking to evolve an austerity program of operation in the hope that some plan can hopefully be advanced. He has been directed to cut to the bone salaries and all expenses in the effort to at least reach the break even point.

5. The estimates of break even point for loss or profit of operation has varied and changed during the course of the proceeding. At the hearing on September 4th, Jerry Cooper, Comptroller of Brada Miller, testified that "it would take a daily cash

flow or daily gross revenue of $70,000 to break even." At a hearing on October 20th Mr. Cooper testified that "the break even point would require gross receipts of at least $49,676 per day."

## CONCLUSIONS OF LAW

1. That the Debtor-in-Possession having the same powers as the Trustee under Section 365 had the right to elect to reject executory contracts. There is adequate authority that such right to reject included Union Contracts. *Shopmen's Local 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 706 (2nd Cir. 1975); *Brotherhood of Railway, Airline and Steamship Clerks, AFL–CIO v. REA Express, Inc.*, 523 F.2d 164 (2nd Cir. 1975), cert. denied 423 U.S. 1017, 1073, 96 S.Ct. 451, 855, 46 L.Ed.2d 389, 47 L.Ed.2d 82, and *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964); also *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–579, 80 S.Ct. 1347, 1350–1351, 4 L.Ed.2d 1409 (1960).

2. The rejection may provoke damages accruing to parties including employees who suffer loss and damage from the rejection. See authorities cited above.

3. All of the cases recognize the duty of the employer to renegotiate or to enter into Collective Bargaining with the representative of the Unions and the rejection of the Contract does not void or cancel the duty under National Labor Relations Act under Section 8(a)(5) to "bargain collectively."

4. The United States Bankruptcy Court is vested with the sole and exclusive jurisdiction over the Debtor, its property, and the determination, proof, allowance, and payment of the claims of creditors. The situation brings into play the duty of the Court to balance the rights of all creditors against any particular claim, even a claim given priority under Section 507(a)(4) enjoying special priority rights. This Court has adequate jurisdiction and power under Section 105 of the Bankruptcy Code and other Sections to protect its exclusive right under the reorganization proceeding and the rehabilitation of the Debtor and the determination of the rights of creditors. Pursuant to Section 502(c) of the Bankruptcy Code the Bankruptcy Court is also under a duty to estimate any allowable claim in bankruptcy. As so adequately put by *Collier's*, 15th Ed., Vol. 2, Par. 365.03:

> "Under Sec. 57(d) of the Act, the claim of the employees arising from the breach caused by the rejection might not have been allowable on the grounds that it was too speculative to be capable of estimation. Now, under Sec. 502(c) of the Code, such claims must be estimated."

Congress evidently intended to vest the Bankruptcy Court with the jurisdiction to enforce rights granted under the National Labor Relations Act and to share the same collaterally with the National Labor Relations Board and other administrative proceedings, even to the point of enjoining or excluding proceedings before such administrative court processes and to the exclusion, in the discretion of the Bankruptcy Court, of the normal administrative processes before the Board.

To hold otherwise would be to surrender the rehabilitation of the Debtor and the orderly process of Chapter 11 proceedings. It is contended that Section 362(b)(4) of the Bankruptcy Code which reads "The filing of a petition ... does not operate as a stay ... (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's *police or regulatory power.*" Emphasis added.

All opposing sides seem to rely, in the final analysis, on the language of the Court *"In the Matter of Shippers Interstate Service, Inc.*, 618 F.2d 9 (7th Cir. 1980) in which:

> "The court so held primarily on the basis of the strong public policies favoring exclusive disposition of substantive labor law questions by the NLRB.

> "In asserting his jurisdiction in this matter, the bankruptcy judge distinguished *Shippers* on the basis of that case's closing paragraph:

" 'On balance, we agree with *Bel Air* that (i)f regulatory proceedings threaten the assets of the estate, the decision to issue a stay can then be made on a discretionary basis.... But where, as here, it appears that the assets of the estate are not threatened and the company is being reorganized rather than liquidated ... regulatory proceedings of the National Labor Relations Board are not subject to the automatic stay provisions of ... (the Bankruptcy Act) ... This does not preclude imposition of a stay where a proper showing was made that the regulatory proceedings threatened the estate assets or that the bankruptcy or other proceedings would result in the liquidation of the company.' " *Shippers*, supra, 618 F.2d at 13.

The situation that Brada Miller finds itself in is somewhat comparable to the much publicized straits in which Chrysler Corporation now finds itself, except that Brada Miller has no hope of government intervention or financial assistance. It is placing its entire future and destiny on the outcome of the Chapter 11 proceedings. Note, Chrysler has requested that its employees make the sacrifice and contribute their labor and cooperation to save and protect their jobs. Brada Miller has not even requested or sought cooperation from its Union employees or the Union and this is what it must do whether it is under the protection of the Bankruptcy Court or not.

It is obvious that if Brada Miller, after fair and open negotiations and efforts to bargain collectively, can survive that it must do so. This is true even though it has a right to cancel the existing contract and start all over again. That effort has to be made whether it is made under the auspices of this Court and proceedings or whether made in the normal free and independent bargaining process as fostered and provided under the National Labor Relations Act.

The Court therefore makes the following FINDING, DETERMINATION AND ORDER That there is ample evidence to support the rejection of the Union Contract which existed prior to petition and the said rejection is approved. The officers of the Debtor, under the guidance of the Trustee, shall immediately start proper proceeding to institute the process of collective bargaining in an effort to negotiate a new Union Contract under which it can operate and the Trustee having been charged with the responsibility of formulating a plan shall report whether the wages contemplated, after negotiation, can be reduced sufficiently to meet the break even point of the operation and whether or not the Company is any better able to survive on a new and negotiated Union Contract than it was on the pre-petition contract. In the meantime, the Trustee is directed to continue the operation of the business and make the reports heretofore ordered, and all parties, including the Local Unions, the National Labor Relations Board, former employees, present employees, and all creditors are each individually and separately enjoined from, in any way, interfering with the operation of the business and its normal flow of traffic, except by petition or complaint filed in this proceeding.

IT IS FURTHER ORDERED That the order entered on September 5, 1980, continuing the injunction "That the Debtor-In-Possession shall not terminate the services or equipment of any owner-driver or owner who was in such status on or after August 1st, 1980, because he refuses to enter into an Independent Contractor's Operating Agreement with the Debtor-In-Possession pending further order of this Court" is REAFFIRMED and continued in full force and effect pending further order of this Court.