**In re The NOVA REAL ESTATE INVESTMENT TRUST, f/k/a First Virginia Mortgage and Real Estate Investment Trust, Debtor.**

**Bankruptcy No. 80–01239.**

United States Bankruptcy Court,
E. D. Virginia,
Alexandria Division.

Sept. 7, 1982.

Roger Frankel, Frankel & Jacobs, Chartered, Bethesda, Md., Henry St. John Fitzgerald, Tolbert, Smith, Fitzgerald & Ramsey, Arlington, Va., for debtor.

Leo Greenfield, Greenfield & DuVal, North Miami, Fla., Harvey M. Lebowitz, Baltimore, Md., for Lou Poller, Landmark Plaza Associates and Landmark Palace Associates.

Michael Cook, Skadden, Arps, Slate, Meagher & Flom, New York City, Michael McGettigan, Murphy, McGettigan, McNally & West, P. C., Alexandria, Va., for Creditors' Committee.

Charles A. Docter, Docter, Docter & Salus, Washington, D. C., for Creditors' Committee of Senior Subordinated Noteholders.

K. Rodney May, Washington, D. C., for S. E. C.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

This case presents an involved and somewhat unusual factual background as well as a series of complex issues for determination.

The debtor is a real estate investment trust ("the Trust"). Beginning in 1971, the Trust made a series of loans to Lou Poller and several partnerships in which he was involved, all collectively referred to hereafter as "Poller". Three of the loans were to finance land purchases in the Landmark area of Alexandria, Virginia. These tracts were ultimately designated as Landmark Plaza, Landmark Palace I and Landmark Palace II.

Poller planned intensive development on the sites, including several high-rise residential condominiums and an office building. Accordingly, he borrowed from the Trust an additional $7,581,250.00 to finance construction of a high-rise condominium apartment building known as the "Olym-

**64**

pus" on the Landmark Plaza tract. Building costs soon exceeded the original amount of the construction loan, which was increased by various amendments, to an eventual total of more than $10.2-million. Maryland Casualty Insurance Company ("Maryland Casualty") issued a payment and completion bond on the construction contract naming the Trust and Poller among the insureds.

Difficulties plagued the enterprise and by April 1974 Poller was searching for additional financing. Through the services of a finder, he located Messrs. C. J. Coakley and Vail W. Pischke who agreed to assist Poller either by purchase of the Plaza and Palace projects or by joining the existing partnerships. Finally on April 25, 1974, negotiations resulted in the execution of a multiparty agreement between the Poller entities, Coakley and Pischke and their wives, and the Trust.

By March 1975, Coakley and Pischke had defaulted; the Olympus building was nearly complete but Poller was in default on all the Plaza and Palace loans. Foreclosure by the Trust was imminent. On March 14, 1975, in an effort to assure completion of the Olympus, Poller signed a deed and property transfer agreement conveying to the Trust the Palace I and Palace II lands. By virtue of the deed, Poller conveyed his entire interest in the property except that he retained an eight-month option to repurchase the sites. The conveyance was made subject to the existing notes and deeds of trust which were expressly continued in effect. The Trust agreed to continue funding for the Olympus.

In June 1975, again facing impending foreclosure, this time on the Plaza tract which included the nearly-completed Olympus building, Poller executed on June 13, 1975, a deed and property transfer agreement which conveyed to the Trust the Olympus condominium and the Plaza land. This conveyance also was made subject to the existing notes and deed of trust, which obligations of Poller were expressly continued in effect. This "Property Transfer Agreement of June 13, 1975" specified how the Trust was to apply receipts from the Plaza project.

In the summer of 1978, Poller filed suit against the Trust and others in the Circuit Court of Dade County, Florida. On October 21, 1980, the Florida court entered an order defining the issues to be tried, all of which related to the Landmark Plaza and Landmark Palace ventures.

On October 30, 1980, the Trust filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, triggering the automatic stay of proceedings against the debtor outside this Court. Shortly thereafter, the Trust removed the Florida case to the Bankruptcy Court for the Southern District of Florida and then sought to transfer the matter to this Court. The Florida Bankruptcy Court, however, denied the application to transfer and remanded the case to the Dade County Circuit Court. Subsequently, this Court modified the automatic stay to permit Poller to resume activity in the Florida case.

In the meantime, Poller had filed a "Notice of pending lawsuit (Unliquidated Class 3 claim/proof of claim)" in the debtor's reorganization proceeding here. The debtor objected to Poller's proof of claim. At a hearing to consider the objection, counsel for the debtor suggested that it might be necessary for this Court to estimate the Poller claim since it might affect the feasibility of the debtor's reorganization plan. Section 502(c) of the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code") provides for the estimating by the Court of any contingent or unliquidated claim "fixing or liquidation of which ... would unduly delay" the case. 11 U.S.C. § 502(c) (1979).

Poller asserts that his claim against the Trust is worth $12-million. The debtor's Disclosure Statement notes that if the currently unliquidated claim is allowed in an amount exceeding $1.5-million, Poller's claim could affect the feasibility of the reorganization plan. In addition, the debtor's proposed second amended reorganization plan gave creditors who accepted it the right to withdraw those acceptances if the plan were not confirmed by this Court by

March 31, 1982. If Poller's claim were neither liquidated nor estimated before that deadline, the plan could not be confirmed because Section 502(c) requires all claims against the debtor to be converted into dollar amounts. *See,* House Report No. 95–595, 95th Cong., 1st Sess. 354 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

No trial date had been set by the Florida court by November 16, 1981, when this Court held a hearing on confirmation of the debtor's plan.

■ Awaiting the outcome of the Florida litigation thus would have unduly delayed the progress of the case and very likely frustrated the debtor's reorganization effort due to the provision in the plan for withdrawal of acceptances if the plan were not confirmed by March 31, 1982. Simply allowing the claim in full as stated by Poller, on the other hand, could have jeopardized the feasibility of the debtor's plan. Accordingly, this Court determined that this was a proper case in which to estimate the Poller claim pursuant to Section 502(c).

The Court heard eight days of testimony regarding the claim and, on March 29, 1982, incorporated into the record in open court its findings and conclusions of the estimate of the value of each portion of the Poller claim. This memorandum supplements the findings and conclusions made on the record.

Poller steadfastly resisted estimation of his claim. Section 502(c) of the Bankruptcy Code, however, states in pertinent part:

(c) There *shall* be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, fixing or liquidation of which, as the case may be, would unduly delay the closing of the case. . . .

11 U.S.C. § 502(c) (1979), (emphasis added).

This language is mandatory, not permissive, and creates in the Court an affirmative duty under proper circumstances to estimate any unliquidated claim such as Poller's.

The legislative history of Section 502(c) supports this interpretation and makes it clear that Congress, in drafting Section 502(c), intended that the Court should estimate any claim, actual liquidation of which would unduly delay closing of the estate. The Senate and House reports on this subsection contain identical language as follows:

Subsection (c) requires the estimation of any claim liquidation of which would unduly delay the closing of the estate, such as a contingent claim, or any claim for which applicable law provides only an equitable remedy, such as specific performance. This subsection requires that all claims against the debtor be converted into dollar amounts.

House Report No. 95–595, 95th Cong., 1st Sess. 354 (1977); Senate Report No. 95–989, 95th Cong., 2nd Sess. 65 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5851, 6310.

Section 502(c) was among the many new provisions of the Bankruptcy Code. There are few reported cases interpreting this subsection. Those few, however, uphold the view that Section 502(c) is a mandate to the court to estimate a claim when liquidation is impractical or would unduly delay the proceedings.

In a recent Chapter 11 reorganization case in which the debtor had rejected its union contract, giving rise to an unliquidated claim for damages, the bankruptcy court ruled that it had a duty to estimate employee claims flowing from the contract rejection. *In re Brada Miller Freight System, Inc.,* 8 B.R. 62 (Bkrtcy.N.D.Ala.1980). The court stated further that "[t]o hold otherwise would be to surrender the rehabilitation of the Debtor and the orderly process of Chapter 11 proceedings." *Id.* at 66. *See also, In re Unit Parts Co.,* 9 B.R. 386 (Bkrtcy.W.D.Okl.1981). The duty of the bankruptcy court to estimate unliquidated or contingent claims has been asserted also in cases brought under Chapter 13. *In re Blossfeld,* 13 B.R. 534 (Bkrtcy.N.D.Ill.1981).[1]

1. In one case the court declined to engage in estimation. *In re Terry,* 12 B.R. 578 (Bkrtcy.E.

Although Section 502(c) is a newly codified section of the Bankruptcy Code, estimation of claims is not new to bankruptcy proceedings. Under Section 57d of the old Bankruptcy Act, bankruptcy courts could, and in fact did, estimate creditors' claims. *See* 3 *Collier on Bankruptcy* (14th ed.), ¶ 57.15[3.-3], p. 263–64 (1977).

In estimating claims under the old Act, bankruptcy courts were directed to use a "generous and liberal" standard, yet give "due regard ... to the rights of other creditors." *In re William Rakestraw Co., Inc.,* 450 F.2d 6 (9th Cir. 1971). At least one authority indicates that the estimate should be reasonable, and not arbitrary. 3 *Collier on Bankruptcy,* ¶ 57.15[3.3], p. 264 (1977). Regardless of whether a court applies a "generous and liberal" standard or a "reasonable" one, the result can only be an estimate. An estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delay the matter.

Poller now will proceed to liquidate his claim in the Florida court. In the event that he recovers an amount that exceeds the Trust's ability to pay in full, he will not find himself without recourse here. Under Section 502(j) of the Bankruptcy Code, claims may be reconsidered for cause "according to the equities of the case" as long as the case has not been closed. 11 U.S.C. § 502(j) (1979). Thus, Poller might seek—in that circumstance—to have his claim adjusted upward pursuant to Section 502(j). Similarly, the debtor also might seek reconsideration, should the Florida litigation turn out more favorably to it than this Court's estimate.

Preliminarily, Poller raises two issues which, although lacking in monetary value, directly affect the merits of his other claims and, ultimately, the value that may be estimated for those claims. These issues are:

(1) whether the Trust stood in a fiduciary relationship to Poller as a result of the June 13, 1975 Property Transfer Agreement, and (2) whether the Trust was merely the "alter ego" of certain other corporations to which it was related so as to justify "piercing the corporate veil" and holding the Trust liable for the acts of other entities.

Poller asserts that the Property Transfer Agreement of June 13, 1975 by which the Trust took title to the Landmark Plaza property (including the Olympus condominium highrise then nearing completion) created a fiduciary relationship between the Trust and Poller. Poller contends further that the Trust breached its alleged fiduciary duties to him in a variety of ways, *e.g.,* permitting completion of the Olympus and sales of units therein to proceed so slowly that losses resulted; and entering into settlements of two major claims relating to the project in bad faith, with resulting losses to Poller.

■ A fiduciary relationship is created by a trust which may be either express or implied and in which there exists a "confidential relationship". The trustee in such a relationship is bound to act for the benefit of another. The relationship typically arises when the parties do not deal on equal terms but, rather, one side is demonstrably weaker or dependent. *See generally,* 19 Michie's Jurisprudence of Virginia and West Virginia, *Trusts and Trustees,* § 2 (1979 Repl. vol.).

There are important distinctions to be noted between the trustee-beneficiary relationship and that of debtor and creditor. A trust involves a duty of the fiduciary to deal with particular property for the benefit of another. The beneficiary of the trust has an equitable interest in the trust property and is, in fact, its equitable owner. The debtor-creditor relationship, on the other hand, involves only the obligation to pay

---

D.Wis.1981). The unique facts of the *Terry* case, however, make it clearly distinguishable. No proof of claim had been filed there and the claim involved could not have affected the debtor's Chapter 13 plan. In those circumstances, the fact that the claim remained unliquidated caused no delay in the case. The duty to estimate under Section 502(c), therefore, never arose.

money; it endows the creditor with merely a personal claim against the debtor. Unless and until the creditor obtains a judgment and subjects the debtor's property to the satisfaction of that judgment, the creditor has no legal or equitable interest in the property of his debtor. *Broaddus v. Gresham,* 181 Va. 725, 26 S.E.2d 33 (1943); 19 Michie's Juris., *Trusts and Trustees,* § 3 (1979 Repl. vol.).

■ If there is no document or other expression creating a trust, an implied trust nevertheless may be established. Such a trust must be founded either upon the presumed intent of the parties as inferred from the circumstances (resulting trust) or under circumstances such that the law will impose a trust to prevent fraud or injustice regardless of the intent of the parties (constructive trust). *See* 19 Michie's Juris., *Trusts and Trustees,* §§ 24 and 48 (1979 Repl. vol.). To establish fraud as the basis for a constructive trust, the facts supporting the allegation must be pleaded with specificity and proved by clear, cogent and convincing evidence.

■ Poller bases his assertion of a fiduciary relationship on the Property Transfer Agreement of June 13, 1975. Under the terms of that agreement, Poller transferred to the Trust legal title to the Landmark Plaza project. He entered into that agreement on behalf of himself and Landmark Plaza Associates (of which he was the sole general partner) to prevent foreclosure by the Trust on its Deed of Trust on the property.

Paragraph 2 of the agreement specifies that conveyance of title to the property "is to be specifically made subject to the Plaza Loan" (secured by the Deed of Trust) and that the parties did not intend the interests of the Trust as owner of the fee (legal title) and beneficiary of the Deed of Trust to merge. Paragraph 2 states further that the parties did not intend any release of Poller's (or Plaza's) liability on the Plaza Loan. The deed transferring title to the Trust,

signed by Poller and attached as "Exhibit A" to the agreement, conforms to the provisions of paragraph 2. The deed expressly makes the conveyance subject to the lien of the Deed of Trust and preserves the lien "for the benefit of the Grantee".

On March 14, 1975, prior to the June 13, 1975 transfer, Poller had similarly transferred to the Trust legal title to the Landmark Palace I and Palace II properties. The terms of that transfer were substantially the same as those of the June 13, 1975 agreement, and the deeds effecting the transfer also were made subject to existing liens held by the Trust with no merger of the Trust's interests as owner of the fees and beneficiary of the Deeds of Trust.

In consideration for these transfers, the Trust obligated itself *inter alia* to waive certain interest, fund "soft costs" of the Plaza project, complete the Plaza project, and sell the condominium units as expeditiously as reasonably possible. Paragraph 12 of the June 13, 1975 (Plaza) Property Transfer Agreement spelled out how the Trust was to apply the proceeds from the sale of the completed condominiums. Any funds remaining after payment of expenses and repayment of the loans were to be paid to Plaza (Poller).

A trust or fiduciary relationship involves a dominant party who is obligated to act toward the subordinate one not with neutrality but affirmatively for the subordinate party's benefit. Poller transferred his properties to the Trust because his loans were in default and the Plaza project, from which he expected to realize enough money to pay his debts, was still incomplete. From these circumstances, in which Poller was dealing from a position of weakness, he seeks to show that the Property Transfer Agreement of June 13, 1975 made the Trust not only his creditor but also his trustee.

There are no words creating an express trust in the Property Transfer Agreement [2]. The only express trust relationship in this

---

**2.** Both the "Plaza" and the "Palace" Property Transfer Agreements specifically disclaim the creation of a partnership and the "Palace" agreement further disclaims any equitable mortgage, two relationships which may give rise to fiduciary duties.

case is that created by the various deeds of trust on the Plaza and Palace properties. By those documents, Poller made a grant to the third-party trustees under which the Trust was the beneficiary and held an equitable interest in the properties to the extent of the amount loaned.

If the Trust owes Poller a fiduciary duty at all, it can arise only from an implied trust and must meet the requirements of either a resulting or a constructive trust. In finding a resulting trust, the court must give effect to the actual intent of the parties as inferred from the circumstances of the particular transaction. In the instant case, the Property Transfer Agreement of June 13, 1975 contains an express declaration of the intent of the parties. A reading of the document demonstrates that the intent was to provide for the completion of the Plaza project and payment of the loans and no more. Eight days of testimony heard by this Court adduced no evidence of circumstances that would support even an inference of any other purpose. Thus, the Court must find that no resulting trust for Poller's benefit was ever created. A court may, under the proper circumstances, impose a constructive trust to undo a fraud or correct an injustice. We are unable here to find any such injustice in the terms of the Property Transfer Agreement and Poller has neither pleaded nor proved any specific act of fraud by the Trust. Therefore, there is no basis upon which a constructive trust can be imposed.

Thus, without any evidence of an intent to establish a trust and absent express language in the agreements creating fiduciary duties, the relationship between the Trust and Poller can be construed to be no more than the contractual duties enumerated in the agreements.

Accordingly, this Court must conclude that no fiduciary relationship exists between the Trust and Poller[3]. Furthermore, assuming arguendo that such a relationship had been established, the record fails to reveal any evidence that establishes any breach of such a relationship by the Trust.

■ Poller contends that the Trust, although it is a publicly-owned corporation, is really the "alter ego" of its original sponsor, First Virginia Bank ("Bankshares"). He further asserts that two wholly-owned subsidiaries of Bankshares, Arlington Mortgage Co. ("Arlington Mortgage") and First Advisors, Inc., ("First Advisors") also functioned as "alter egos" of Bankshares. These assertions of Poller present no direct claim for estimation by this Court. Certain of Poller's claims against the Trust, however, arise from activities of Bankshares, Arlington Mortgage and First Advisors. Those claims can be maintained against the Trust only by "piercing the corporate veil". In order to estimate the claims, therefore, it is necessary that we assess Poller's assertion that the existence of the four corporations as four separate entities should be disregarded here.

The doctrine of a corporation as an entity distinct from the individual stockholders comprising it is a legal fiction developed and preserved primarily for its practical value. The doctrine applies equally to all types of corporations including those of which the sole stockholder is another, or parent, corporation. Parent and subsidiary corporations are to be treated as separate in

---

**3.** It should be noted that this issue apparently was decided by the Circuit Court of the City of Alexandria. In a decree issued in a declaratory judgment action brought by the Trust and of which this Court may take judicial notice, Judge Kent ruled:

> "c. The rights between the parties are controlled by the Palace and Plaza Agreements and those documents are valid and enforceable contracts and the rights and duties of the parties ... are as stated in those Agreements."

*First Virginia Mortgage and Real Estate Investment Trust v. Lou Poller,* Chancery No. 9884, decree of April 13, 1979 (Cir.Ct. of Alexandria, Va.).

This Court also notes that the issues presented for estimation here are only those to be litigated in the Dade County Circuit Court in Florida. By Order of October 21, 1980, setting forth the issues to be tried, the Florida court, in effect, also took judicial notice of Judge Kent's ruling by removing from the case the issue of any fiduciary relationship between Poller and the trust.

the absence of circumstances justifying disregard of these separate entities. The fact that two corporations have officers and directors in common, occupy common offices and, to a certain extent, transact business for each other generally does not render a parent corporation liable for the acts of its subsidiary. Furthermore, the fact that one corporation exercises a controlling influence over the other does not necessarily make either the agent of the other. More must be shown, *e.g.*, that one corporation is a mere agency, instrumentality, tool or adjunct of the other. Instances of fraud, conspiracy or evasion of just obligations by one corporation will cause a court to disregard the separate corporate identity of a related corporation. As a rule, however, the principle of piercing the corporate veil is to be applied with caution. *See* 18 Am.Jur.2d, *Corporations*, § 13–17; 19 Am.Jur.2d, *Corporations*, § 716.

The rule in Virginia is even more restrictive. Virginia courts observe the separateness of corporate entities even though one may dominate or control another, and will pierce the veil of separate legal entities only when a corporation is used to protect or justify fraud, crime or other wrongdoing. *Beale v. Kappa Alpha Order*, 192 Va. 382 at 396–7, 399, 64 S.E.2d 789 (1951).

The estimation hearing in this case produced testimony that some overlapping of directors of the corporations has occurred; that some individuals have served as officers of more than one of the corporations; that the Trust had shared office space and personnel with Arlington Mortgage and First Advisors before the Trust became a public corporation; that Bankshares, Arlington Mortgage and First Advisors (but not the Trust) had filed consolidated tax returns in some years; that Bankshares filed a proof of loss against its fidelity bond insurer, with a supporting affidavit signed by the president of First Advisors, for the partial use and benefit of the Trust, from which the Trust received the entire amount recovered; and that the initial end loan commitment for Poller's Landmark Plaza project (financed by the Trust) had come from Arlington Mortgage. Documents in evidence corroborate much of this testimony.

This evidence, although extensive, fails to show that any of the corporations used the fiction of the separate legal identity of the related organizations to evade liability for any fraud or wrongdoing toward Poller. This Court must find that the evidence here, viewed in its entirety, does not meet the test for piercing the corporate veil as set forth in the *Beale* case, *supra*.

Therefore, the Court finds that the separate legal identities of Bankshares, Arlington Mortgage, First Advisors and the Trust will not be disregarded.

### LIABILITY FOR FAILURE TO FUND "SOFT COSTS"

Poller has asserted that the Trust breached its loan agreements with him by failing to fund the so-called "soft costs" of the Landmark Plaza project. The Trust argues that its funding obligations under the construction loan agreement were only for "hard" costs supported by requisitions submitted by the general contractor. Poller admitted that the Trust paid the contractor's requisitions.

By the terms of the Landmark Palace I and Palace II Property Transfer Agreements of March 14, 1975, the Trust did agree to provide Poller with specified monthly amounts for administrative funding, advertising and similar "soft" items. There is no evidence, however, that the Trust failed to fulfill those obligations, which apply only to the period subsequent to March 14, 1975.

This Court finds that Poller has failed to prove that the Trust either breached its loan agreements or failed to fulfill its obligation to pay the amounts specified in the March 14, 1975 agreement. Accordingly, the Court estimates that Poller has no claim against the Trust for non-payment of "soft costs".

### LIABILITY FOR END LOANS

At the outset of these estimation proceedings, Poller asserted a claim for damages

against the Trust based upon the loss of an end loan commitment made to him by Arlington Mortgage. However, any liability of the Trust for such an act of Arlington Mortgage could accrue only by a determination permitting the piercing of the corporate veil, something the Court has declined to do here.

In addition, the Trust introduced evidence tending to show that Poller had released the Trust from any liability on claims arising prior to April 25, 1974. The evidence presented consisted of a release signed as a part of the Coakley-Pischke agreement which this Court ruled was a valid general release of the Trust. As a result of this ruling, the Court estimates that Poller has no viable claim for damages based upon the Trust's actions prior to April 25, 1974.

## THE MARYLAND CASUALTY SETTLEMENT

The Trust and Poller were both named insureds under a performance bond issued by Maryland Casualty on the Landmark Plaza project. Both the Trust and Poller had claims against Maryland Casualty based upon the failure of the general contractor to perform. Both brought suits which were consolidated for trial. The Trust settled its claim, and Poller settled one week later.

The terms of the Trust's settlement included, *inter alia,* payment to the Trust of $300,000.00 cash, and satisfaction by Maryland Casualty of certain mechanics' liens against the project totalling approximately $1-million. The Trust, pursuant to paragraph 6 of the Plaza Property Transfer Agreement of June 13, 1975, was entitled to receive also the "net proceeds" of any recovery Poller might effect against Maryland Casualty. As part of its settlement with Maryland Casualty, the Trust assigned to Maryland Casualty any such "net proceeds" it might receive.

Poller's settlement, one week later, provided for a payment to him of $50,000.00, characterized as attorney's fees, and an assignment back to Poller of any "net pro-

ceeds" that Maryland Casualty had a right to receive from the Trust.

Poller contends that by the assignment back to Poller's adversary (Maryland Casualty) the Trust destroyed that which Poller hoped to receive in the suit. Therefore, Poller contends further, the Trust should credit him with $5.7-million, the full "value" of his claim against Maryland Casualty.

The Trust argues that it assigned away nothing of Poller's but only what it would have received if Poller had recovered anything beyond his expenses in the suit. In making this argument, the Trust draws a distinction between a claim or cause of action and the "net proceeds" recovered on a claim or cause of action. The Trust maintains also that its settlement with Maryland Casualty was of its claim only and did not involve Poller's claim in any way. In addition, the Trust defends its settlement by noting that the Alexandria Circuit Court had ruled in prior litigation involving mechanics' liens, that Poller and the general contractor had departed materially from the payment procedures stated in the building contract. Such a modification of the contract without approval by the bonding company could have had the effect of releasing Maryland Casualty from its obligation as surety. The Trust argues that this ruling provided Maryland Casualty with a substantial defense, increasing the risk of no recovery at all for either the Trust or Poller if the trial continued.

The facts here present a novel question: the effect of the circular assignment and re-assignment of the "net proceeds" of Poller's claim against Maryland Casualty. The circumstances here are analogous to those in which the obligation on a note is discharged when the note returns to the hands of its original maker. *See* U.C.C. § 3–601; Va.Code § 8.3–601 (1965). The analogy breaks down, however, if a claim and the "net proceeds" of that claim are as distinct from each other as the Trust's argument would make them.

This Court is a court of equity which must look at the substance rather than

merely the form of a particular transaction. For purposes of estimating Poller's claim on this issue, therefore, this Court finds that by assigning back to Maryland Casualty the net proceeds of any recovery Poller might make against the bonding company, the Trust effectively extinguished Poller's claim on the bond and rendered further pursuit of recovery useless.

Maryland Casualty, however, could have raised a substantial defense and Poller has declined to offer any proof of what he reasonably could have expected to recover in the absence of the assignment back by the Trust, relying instead on the $5.7-million figure which represents only what he sought in the case. For purposes of this proceeding, therefore, this Court estimates that the value of this claim could not exceed $1.3-million. This sum represents the value of the mechanics' liens satisfied by Maryland Casualty, plus the cash received by the Trust, all of which should be credited to Poller as revenue "derived from the Plaza Project" pursuant to paragraph 12 of the Plaza Property Transfer Agreement of June 13, 1975.

## THE INA SETTLEMENT

Poller asserts that the Trust should credit him with the full $3.5-million recovered as a result of a claim against the Insurance Company of North America ("INA"). The claim was made by Bankshares on behalf of itself and others, including the Trust, pursuant to the provisions of the fidelity bond issued by INA. Losses attributed by the Trust to its loans to Poller were included in the claim. These claimed losses totalled an unspecified amount in excess of $1,968,-000.00. Bankshares settled the claim for a lump sum. No allocation was made among the 35 matters on which the claim was based.

The Trust disputes Poller's right to any credit based upon the Trust's recovery from

INA. It is the Trust's position that this recovery is not revenue "derived from the Plaza project", the only type of income which the Trust would be required to credit to Poller under the terms of paragraph 12 of the (Plaza) Property Transfer Agreement of June 13, 1975.

Assuming for the sake of estimating the claim that at least a portion of the recovery on the bond is revenue "derived from the Plaza project", then Poller should receive a credit to his account with the Trust. The amount of this credit should reflect the percent of the total claim which the Trust attributed to Poller's loans. The losses claimed as resulting from transactions with Poller represented slightly more than one-seventh of the total for which specific amounts were claimed [4].

Therefore, this Court estimates that Poller's recovery from the Trust on this issue could not exceed one-seventh of $3.5-million, or $500,000.00.

## LIABILITY FOR SLOW SALES

Poller contends that units at Landmark Plaza should have sold out quickly and that the Trust's sales efforts were inadequate, causing losses and damage to Poller. One specific loss claimed is an allegation by Poller that failure of the Trust to complete and sell out the building rapidly rendered him unable to exercise his options to repurchase the Landmark Palace I and Palace II tracts.

The evidence adduced encompasses employment of sales agents, completion of the entire building for occupancy as well as certain contracts that Poller claims had been acquired by him but not closed. A careful examination of the entire record, however, fails to support Poller's allegation of Trust neglect. Therefore, this Court estimates that Poller has no viable claim against the Trust due to slow sales of the units.

---

4. The amount claimed on the fidelity bond has been described as "in excess of $100-million" several times during these proceedings. This Court bases its calculation on the Complaint filed against INA in the effort to collect on the bond, which the Court believes is the most reliable evidence of the amount claimed. The total sought in the Complaint was an unspecified amount over $15-million. Several items, including the claimed loss on the Palace II loan, had no dollar value stated.

## POLLER'S LEGAL FEES

Poller contends that the Trust is indebted to him for the $84,000.00 in legal fees billed by Albert Grenadier for work on the Maryland Casualty claim. The basis for this argument is paragraph 6 of the Plaza Property Transfer Agreement which speaks in terms of "net proceeds". The Trust agrees with Poller that the term "net proceeds" meant net of attorney's fees. Poller argues further that the Trust agreed to pay Grenadier's fee.

It is the Trust's position, however, that Poller made no recovery on his Maryland Casualty claim because the $50,000.00 he received was labelled attorney's fees. Since there was no recovery, the Trust argues, there was nothing from which Grenadier's fee could be deducted. The Trust relies upon a letter from its counsel to Mr. Grenadier to show that it never agreed to any fee for Grenadier in advance of an actual recovery by Poller against Maryland Casualty.

This Court finds that paragraph 6 of the Plaza Property Transfer Agreement is a clear statement of the intent of the parties on this issue. Any recovery from Maryland Casualty by Poller was to be paid to the Trust and credited to Poller's account "net" of Poller's attorney fees in the matter. Since Poller collected from Maryland Casualty only an amount labelled as attorney's fees, he in fact realized no recovery in the matter. The Trust never agreed to pay any attorney's fees of Poller other than as stated in paragraph 6 of the Plaza Property Transfer Agreement.

However, this Court also has ruled that the Trust itself is partially responsible for preventing Poller from recovering anything from Maryland Casualty.

Therefore, this Court estimates that the maximum amount for which the Trust could be liable to Poller is $50,000.00 in legal fees payable to Albert Grenadier.

## THE COAKLEY-PISCHKE SETTLEMENT

In April of 1974, the Trust entered into an agreement with Poller and two other parties, C. J. Coakley ("Coakley") and Vail W. Pischke ("Pischke"). Under this agreement, Coakley and Pischke were to become responsible for all of the Landmark Plaza project's construction costs in excess of $9.5-million. Subsequently, Coakley and Pischke defaulted and the Trust eventually sought damages against Coakley [5]. Walter Stephens, the attorney who represented the Trust in this matter, testified at the estimation hearing that he believed the Trust could have obtained a $3-million judgment against Coakley. A judgment in that amount would have been uncollectible, however, in his opinion. Stephens testified that he urged the Trust to settle for about $150,000.00 but that the Trust refused. Under the circumstances, Stephens testified, he believed the $275,000.00 later offered and accepted was "excellent".

This Court finds that the Trust accepted the sum of $275,000.00 in settlement based upon the best information available to it. There is no evidence of bad faith. The Trust did recover $275,000.00 on the claim, however, and should credit Poller with that amount. Therefore, this Court estimates that Poller's claim against the Trust on this issue has a value of $275,000.00.

Poller contends that the Coakley-Pischke agreement had the effect of limiting his liability on the Landmark Plaza project to $9.5-million. Poller contends further that even though he resumed responsibility for the project following Coakley's and Pischke's default, the settlement by the Trust of its claim against Coakley for $275,000.00 estops the Trust from seeking to collect from him any costs of the project in excess of $9.5-million.

The Court finds this argument to be without merit. First, the Coakley-Pischke agreement itself expressly states that Poller, along with Coakley and Pischke, would be liable for "all monies . . . needed for the completion of the Plaza Project". The agreement states further that this liability would continue regardless of whether Coak-

5. The Trust sued Coakley only, Pischke having become insolvent in the interim.

ley and Pischke performed as contemplated. Second, Poller continued to assume responsibility for the Landmark Plaza project and signed off on payment requisitions after Coakley and Pischke defaulted. Third, Poller signed an amendment or "allonge" to the Plaza construction note increasing the amount of that note to approximately $10.3-million, also subsequent to the default. And, fourth, Poller acknowledged this increase of the loan to $10.3-million in both the Palace and the Plaza Property Transfer Agreements.

Having thus acknowledged his liability for costs beyond $9.5-million on at least four separate occasions, Poller will not be heard now to deny that liability. Therefore, this Court finds that for purposes of this estimation, the principal amount owing from Poller to the Trust for the construction costs on the Landmark Plaza project is $10,281,250.00.

## ACCOUNTING BY THE TRUST

Poller contends that the Trust should credit him with $3,459,308.00 on the transaction by which the Trust in 1975 obtained title to the Landmark Palace I and Palace II properties. This figure represents the difference between the principal amounts of Poller's loans on the properties and the values assigned to them in a September 1974 appraisal by Citicorp. It is Poller's position that the Trust received property worth about $3.5-million more than the cost to the Trust of acquiring it, and the Trust should, therefore, credit him with that amount. In support, Poller relies upon the case of *Central Hanover Bank & Trust Co. v. Roslyn Estates, Inc.,* 266 App.Div. 244, 42 N.Y.S.2d 130 (1943). The rule of that case is that a party "should not be permitted to obtain a double recovery by appropriating the security and then enforcing the debt without regard to the value of the security." *Id.* at 134.

The Trust contends that since the Palace Property Transfer Agreement made no provision for credit to Poller, no credit is due

him beyond the amounts actually realized when the properties were sold. The Trust regards as controlling the Palace Property Transfer Agreement and the related deeds executed by Poller. Under the terms of those documents Poller remained fully liable on the Palace notes which continued in effect. The deeds were made subject to existing liens of the Trust with no merger of the Trust's interests as owner of the fees and beneficiary of the deeds of trust. The Trust argues that it fulfilled its obligation to Poller by crediting to his loan account the proceeds of the 1978 sale of Palace II and the 1980 sale of Palace I. By the Trust's determination, which takes into account interest accruals, Poller remained in a debit position following the sales, with further interest continuing to accrue on the reduced debt.

To establish the value of the properties at the time of the transfer, Poller relies on the September 1974 Citicorp appraisal [6] which assigned to Palace I a value of $6,265,000.00 and to Palace II a value of $1,872,000.00. Poller presented no corroboration of these values. William S. Corish, president of the Trust, however, testified that the Citicorp appraisal was unreliable because it assumed that the slumping condominium market would turn around in 1975.

The Property Transfer Agreement provided for cancellation of the Palace notes if Poller exercised the repurchase options granted therein. The stated option prices provide the only indicator of what the parties thought the properties were worth at the time of transfer. Those option prices were less than the amounts the Trust eventually realized from the sales.

It is correct that the Citicorp appraisal is based upon a change in the market conditions and without adequate proof establishing this condition of an improved market the Citicorp appraisal cannot be used as a proper indication of value. Rather, the option prices agreed to by the parties are the best indication of value and these establish

---

6. Poller argues also for consideration of the October 1973 appraisal of Richard L. Parli in

the amount of $5,460,000.00. However, that appraisal was never admitted into evidence.

that the values in 1975 were slightly lower than the prices actually obtained in 1978 and 1980.

The Palace notes were in default at the time Poller transferred the properties to the Trust. The Property Transfer Agreement clearly states that Poller continued liable on the notes and that the interest continued to run. Poller could have bargained for immediate credit to his account of any stated values, thus reducing the amount of interest that would accrue.

Poller is an experienced businessman and former bank president. The Property Transfer Agreement, viewed as a whole, demonstrates that Poller obtained several important provisions aimed at salvaging the Plaza project, plus a waiver of all penalties on the Palace loans. Eight days of estimation hearing adduced much argument but no evidence that this transaction was anything but an arms-length bargain. This Court, under such circumstances, should not and will not rewrite the Palace Property Transfer Agreement. Poller must live with the contract he negotiated and signed.

Therefore, this Court finds that even if Poller had established clearly the value of the Palace properties at the time of their transfer, he would not be entitled to have a credit applied in that amount as of the date of the transfer.

The Trust took over the Palace properties in lieu of foreclosing. There is no evidence that the Trust failed to make a good faith effort to sell the properties as expeditiously as was commercially reasonable in the circumstances. It is clear also that the Trust has not proceeded to enforce its debt without regard to the value of the security received in violation of the rule in *Roslyn Estates, supra*. Rather, the dispute concerns how and when to ascertain the value of the security. Since Poller is not entitled to a credit as of the date of transfer to the Trust, this Court finds that the most reasonable method for fixing a time and amount for valuing the Palace properties is by crediting Poller with the proceeds realized on the day of sale to a third party, a procedure that conforms to the practice in deed of trust foreclosures.

Therefore, for purposes of estimating an accounting between Poller and the Trust regarding the Palace I and Palace II properties, this Court adopts the following figures:

PALACE I:

| | |
|---|---|
| Loan Principal (10/28/80) | $4,000,000 |
| Accrued Interest to 10/28/80 | 3,763,128 |
| | $7,763,128 |
| Less: Sale Proceeds 10/28/80 | 4,982,436 |
| Balance due from Poller 10/28/80 | $2,780,692 |

(Balance due to accrue interest from 10/28/80 at 5% over the Manufacturers Hanover prime lending rate, but not less than 10% p.a.)

PALACE II:

| | | |
|---|---|---|
| Loan Principal (9/28/78) | $ | 542,818 [7] |
| Accrued Interest to 9/28/78 | | 389,820 [8] |
| | $ | 932,638 |
| Sale Proceeds 9/28/78 | $ | 933,018 |
| Less: | | 932,638 |
| CREDIT TO POLLER | $ | 380 |

Pursuant to a cross-default, cross-collaterization arrangement for all Poller's projects, the gain on Palace II would offset the loss on Palace I, leaving a net balance due from Poller to the Trust of $2,780,-313.00 for estimation purposes.

---

7. It appears that the Trust included in its figures on Palace II the $305,000.00 loan to Coakley and Pischke which was secured by the Palace land. As admitted by the Trust in its brief, Poller did not sign the said note and there is some question whether Poller is liable on this loan despite language in the Property Transfer Agreement indicating that all loans secured by the property had been combined. Therefore, the Court has deducted $305,000.00 from the $847,818.00 figure offered by the Trust.

8. Since the Court has deducted $305,000.00 from the principal as stated by the Trust, a corresponding deduction from accrued interest is necessary. For estimation purposes, the Court has subtracted $50,000.00 from the $439,820.00 accrued interest claimed by the Trust.

Poller contends that as of August 1980 the balance due the Trust on the Plaza notes was $917,429.00. This calculation is based on Poller's interpretation of the Plaza Property Transfer Agreement of June 13, 1975. Paragraph 12 of that Agreement provides for the allocation of revenues derived from the Plaza project and reads, in pertinent part:

> (iii) Payment of the Plaza loan, principal, interest and expenses (interest from the date of this Property Transfer Agreement to be calculated at the rate of eleven percent (11%) per annum). . . .

It is Poller's position that the placing of the word "principal" ahead of the word "interest" in the quoted text means that the parties intended for the Plaza project revenues to be applied first to reduce principal and only after that to repayment of interest.

The Trust contends that as of September 1980 Poller owed the Trust $7,174,693.00 of principal plus $716,763.00 in accrued interest for a total of $7,891,456.00. Subsequent interest accruals bring the total claimed due as of February 18, 1982 to $8,214,216.00. It is the Trust's position that the payment terms stated in the notes control the allocation of receipts and that the notes provide for payment of interest first and principal second.

The language of subparagraph (iii) of paragraph 12 of the Plaza Agreement is ambiguous, especially when considered in conjunction with the terms of the Plaza note. The note calls for payment of interest only, with the entire principal due on a date certain, originally December 1, 1974, later amended to December 31, 1975. Contract law is well-settled that courts are to construe ambiguous language against the drafter of the document. *Moulor v. American Life Insurance Co.,* 111 U.S. 335, 4 S.Ct. 466, 28 L.Ed. 447 (1884). The directive is meaningless, however, when the drafter has created two apparently conflicting documents as the Trust has done here. More helpful is the rule that an otherwise ambiguous term which has an established meaning in business should be so interpreted.

*Stewart-Warner Corp. v. Smithey,* 163 Va. 476, 490, 175 S.E. 882 (1934). The phrase "principal, interest and expenses" is commonly used in banking. The custom and usage of the banking industry, nevertheless, is to apply payments to interest first in the absence of express provisions otherwise.

The purpose of this estimation proceeding, however, is merely to estimate the Poller claim to determine whether the Trust's plan of reorganization is a feasible plan that should be confirmed. If computing the status of Poller's Landmark Plaza loans by applying payments to reduction of principal first, as Poller suggests, does not jeopardize the plan of reorganization, this Court need not rule on the interpretation of the contract at issue.

Having determined, on the basis of the computations shown hereafter, that giving Poller the full benefit of the ambiguity created by subparagraph (iii) of paragraph 12 of the Plaza Agreement does not jeopardize the plan of reorganization, this Court respectfully leaves the resolution of that issue to the Florida court.

### Status of Plaza Loan as Computed by the Trust

| | |
|---|---|
| Principal owing 9/80 | $7,174,693 |
| Interest to 9/80 | 716,763 |
| | $7,891,456 |
| Interest 9/80 to 3/82 | 322,805 |
| Balance due the Trust | $8,214,261 |

### Status of Plaza Loan as Computed by Poller

| | |
|---|---|
| Principal owing 8/80 | $ 917,429 |
| Interest 9/80 to 3/82 (computed by the Court) | 151,375 |
| Balance due the Trust | $1,068,804 |

### LIBEL AND SLANDER

■ Poller presents for estimation here a claim of libel and slander against the Trust, which issue has been reserved for jury trial in the pending action between the parties in Florida. Poller contends that the Trust libelled him by publishing false information about him in the proof of loss and supporting letter affidavit submitted to the Insurance Company of North America ("INA"). Poller has asserted several theories by which he claims that statements in the two

documents are libelous. At times Poller has claimed that many of the statements about him were untrue. At other times, he has argued that the libel arose from the Trust's statement that it would not have granted loans to Poller if the derogatory information had been disclosed at the outset. Poller contends that the Trust had all the information when the loans were granted. The allegations and evidence are unclear regarding Poller's basis for the claim of slander. His testimony indicates that he believes it arises from certain questions put to him at various oral depositions taken pursuant to his litigation with the Trust.

The proof of loss submitted to INA by Bankshares was signed by Edmund P. Shevlin, vice president and general counsel of Bankshares. The letter affidavit was submitted by First Advisors and signed by Robert H. Zalokar, president of that corporation. Bankshares submitted the proof of loss on behalf of itself and others, including the Trust. The fidelity bond issued by INA expressly permitted Bankshares in its "sole discretion" to include in a claim losses sustained by others (e.g., bank customers). First Advisors was serving as advisor to the Trust at the time the Poller loans were approved and closed.

This Court has already ruled that, based upon the record, it would be improper to pierce the corporate veil in this case. Therefore, Poller must show that Bankshares and First Advisors acted as the Trust's agents in this matter if he is to recover from the Trust for alleged libelous statements appearing in documents of Bankshares and First Advisors.

There is no evidence here of any express appointment of Bankshares or First Advisors as agents of the Trust. In an implied agency, the agent holds himself out as having authority to act for the principal and, thereafter, the principal ratifies the agent's acts by failing to refute the inference and by the fulfilling of the obligations to which his agent has bound him. Such an implied agency usually is demonstrated by a course of dealings between the parties.

Neither the documents in evidence nor the testimony adduced at the hearings indicate that Bankshares or First Advisors acted as the Trust's agent in seeking to recover on the fidelity bond.

In addition, Virginia recognizes a qualified privilege when a defamatory communication is made in good faith by a person who "has an interest" in the subject matter, particularly when the statement is made to another "having a corresponding interest or duty." *Marsh v. Commercial and Savings Bank of Winchester,* 265 F.Supp. 614, 621 (W.D.Va.1967).

Poller's position seems to be that the Trust cannot claim the qualified privilege because the statements in the documents were not made in good faith. The thrust of the letter affidavit is that although some employees of the four related organizations knew a great deal about Poller, those employees withheld that information from the members of the loan approval committee. Thomas K. Malone, Jr., an officer of Bankshares and First Advisors and a member of the loan approval committee when the Poller loans were made, testified that he first became aware of unfavorable information about Poller "in the spring" of 1973 or 1974, after the loans had closed.

Further, in the case of any tort, such as libel, proof of which requires the plaintiff to show malice on the part of the defendant, Virginia recognizes the principle of law that acting on advice of counsel is an affirmative defense. *Bain v. Phillips,* 217 Va. 387, 228 S.E.2d 576 (1976). Extensive evidence before this Court demonstrates that Bankshares engaged outside counsel with special expertise in fidelity bond work to prepare the INA documents. The proof of loss and the letter affidavit were the product of approximately two years of investigation by the outside attorneys.

As to the slander claim, Poller admitted in testimony before this Court that the answer to the allegedly slanderous question was "yes". Poller also stipulated to the truth of the statement that formed the substance of the question.

This Court finds that Bankshares and First Advisors did not act as agents for the Trust in filing the proof of loss and letter affidavit. Therefore, the Trust cannot be liable for any defamatory statements the documents may contain.

In addition, the Court finds that even if the statements could be attributed to the Trust, there is no evidence that the statements were made in bad faith. Virginia's qualified privilege and the fact that competent counsel prepared the documents would, therefore, in all likelihood, prevent Poller from recovering.

In connection with the claim of slander, as indicated above, it must be noted that Poller stipulated to the truth of the statement.

Accordingly, even assuming that Poller had been successful in piercing the corporate veil, he would not be able to establish liability against the Trust.

In the Florida action, Poller is proceeding against not only the Trust but also Bankshares, Arlington Mortgage and First Advisors. Poller may well recover a substantial amount against some of the defendants there. In this estimation proceeding, however, the Court considers only the value of Poller's claims against the Trust.

Therefore, for the foregoing reasons, this Court estimates the value of Poller's claim against the Trust for libel and slander to be zero.

## CONCLUSION

This determination has estimated several credits to Poller from various aspects of his claim against the Trust. These credits total $2,125,000.00, broken down as follows:

| | |
|---|---|
| From the Trust's INA settlement.... | $ 500,000 |
| From the Trust's settlement with Coakley | 275,000 |
| From the Trust's Maryland Casualty settlement | 1,300,000 |
| For legal fees of Albert Grenadier ... | 50,000 |
| TOTAL | $2,125,000 |

Poller, however, owes the Trust substantial amounts on both the Plaza and the Palace loans. Poller does not dispute the fact of these offsetting obligations, only the amount of them. By the Trust's calculation of the current balances on the Plaza and Palace loans, Poller now owes the Trust approximately $11-million on the combined loans. Deducting Poller's credits as estimated here would leave Poller still indebted in the amount of $9,274,018.00, as set forth below:

*Using the Trust's Method:*

| | |
|---|---|
| Due to the Trust on Plaza.......... | $ 8,214,261 |
| Due to the Trust on Palace ........ | 3,184,757 |
| | 11,399,018 |
| Less: Estimated Credits from this proceeding.................... | 2,125,000 |
| Balance Due to Trust | $ 9,274,018 |

By Poller's calculations, he owes the Trust only slightly more than $4-million on the combined Plaza and Palace loans. Assuming arguendo this to be correct, subtracting the credits estimated here results in a balance due from Poller to the Trust of approximately $2-million, as shown below:

*Using Poller's method:*

| | |
|---|---|
| Due to the Trust on Plaza.......... | $1,068,804 |
| Due to the Trust on Palace ........ | 3,184,757 |
| | 4,253,561 |
| Less: Estimated Credits from this proceeding.................... | 2,125,000 |
| Balance Due to Trust | $2,128,561 |

Thus, employing Poller's method for calculating the Plaza and Palace loan balances, Poller's damage claims against the Trust, as estimated by this Court, do not exceed the amount that Poller admits he owes on those loans.

Accordingly, for the reasons stated herein and upon the record, this Court finds that the Poller claim does not endanger the feasibility of the Trust's plan of reorganization filed in this proceeding and that the Plan should be confirmed.